# IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT OF HARRISON COUNTY, MISSISSIPPI

STATE OF MISSISSIPPI *ex rel.*
JIM HOOD, ATTORNEY GENERAL OF
THE STATE OF MISSISSIPPI,

        **Plaintiff,**

v.

EXPERIAN INFORMATION
SOLUTIONS, INC.,

        **Defendant.**

Civil Action No.: 14-1212(4

FILED

MAY 16 2014

JOHN McADAMS, CHANCERY CLERK

———————————————— D.C.

## COMPLAINT



## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

PARTIES ............................................................................................................................. 8

JURISDICTION AND VENUE ......................................................................................... 9

FACTUAL ALLEGATIONS ............................................................................................. 9

I.    EXPERIAN HAS FAILED TO IMPLEMENT REASONABLE PROCEDURES TO
      ENSURE THE MAXIMUM POSSIBLE ACCURACY OF CONSUMER CREDIT
      REPORTS IN VIOLATION OF THE FAIR CREDIT REPORTING ACT. ..................... 9
      A.    Experian Fails to Take Reasonable Steps to Improve the Accuracy of
            Consumer Reports................................................................................................. 11
            1.    Experian's procedures permit and do not prevent "mixed files." .................. 13
            2.    Experian permits inaccurate public record information to be included
                  in consumers' credit reports............................................................................ 19
            3.    Experian does not prevent inaccurate data from re-appearing on
                  consumers' credit reports after deletion or correction. ................................. 22
            4.    Experian fails to ensure that OFAC alerts are accurate. ............................... 22
            5.    Experian fails to ensure that accounts extinguished in bankruptcy are
                  reported accurately.......................................................................................... 24
      B.    Experian Fails to Address Errors that Come to its Attention............................... 26
      C.    Experian Does Not Identify, Address, or Prevent Errors in Data from
            Unreliable Sources................................................................................................ 28
      D.    Experian's Representations that it Provides Accurate Credit Reports and its
            Failure to Employ Reasonable Procedures to Ensure the Maximum Possible
            Accuracy of Credit Reports are Also Unfair and Deceptive Practices. ............... 32

II.   EXPERIAN DOES NOT CONDUCT REASONABLE REINVESTIGATIONS
      OF CONSUMER DISPUTES............................................................................................ 33
      A.    Experian Does Not Itself Reinvestigate Consumer Disputes. .............................. 35
      B.    Experian Creates Impermissible Obstacles to Reinvestigating Disputes. ............ 39
      C.    Experian's Staffing and Compensation Makes it Difficult for Consumers to
            Initiate Disputes and Impossible for Employees to Adequately Record and
            Investigate Them.................................................................................................. 41
      D.    Experian's Reliance on Furnishers to Conduct an Investigation is
            Unreasonable......................................................................................................... 43
      E.    Experian Refuses to Investigate Legitimate Consumer Disputes. ....................... 48
      F.    Experian Does Not Provide Consumers with the Same Information it Gives
            Creditors, Undermining Consumers' Ability to Dispute Inaccuracies.................. 49
      G.    Experian's Failure to Reinvestigate Consumer Disputes is Also Unfair and
            Deceptive. ............................................................................................................ 49

III.    EXPERIAN FAILS TO PROVIDE ALL RELEVANT INFORMATION REGARDING CONSUMER DISPUTES TO THE FURNISHER OF THE INFORMATION.............................................................................. 50

IV.     EXPERIAN FAILS TO EXCLUDE NEGATIVE OBSOLETE ACCOUNTS APPEARING ON CONSUMERS' CREDIT REPORTS. ........................................ 53

V.      EXPERIAN FAILS TO PREVENT INFORMATION THAT WAS DELETED OR CORRECTED FROM BEING REINSERTED ON CONSUMER CREDIT REPORTS.................................................................................................. 55

VI.     EXPERIAN DOES NOT PROVIDE CONSUMERS WITH THEIR FULL CREDIT FILES. ............................................................................................. 57

VII.    EXPERIAN DECEPTIVELY MARKETS CREDIT MONITORING SERVICES AND CREDIT SCORES. ............................................................. 60

VIII.   EXPERIAN ACTED WILLFULLY IN FAILING TO COMPLY WITH ITS STATUTORY DUTIES...................................................................................... 67

REQUEST FOR RELIEF .................................................................................. 81

COMES NOW, the State of Mississippi, by the Honorable Jim Hood, Attorney General

of the State of Mississippi, and files this Complaint against Defendant Experian

Information Solutions, Inc. ("Experian") for injunctive relief, statutory and punitive

damages, civil penalties, restitution, rescission, disgorgement, and costs and attorneys'

fees pursuant to the Mississippi Consumer Protection Act , the Fair Credit Reporting Act,

and the Dodd-Frank Wall Street Reform and Consumer Protection Act. In support

thereof, the State would show unto the Court as follows:

## INTRODUCTION

1.      Experian, known as a national credit reporting agency[1] ("NCRA" or "credit

bureau"), gathers, produces, and discloses credit reports[2] on virtually every

Mississippi consumer. These credit reports include, among other important

details, the credit extended to consumers, their history of payments, defaults, or

bankruptcy, and judgments or liens entered against them, and are used to

determine whether and on what terms a consumer will be offered credit cards,

student, car, and small business loans, mortgages, rental housing, and insurance.

Prospective employers may check the credit reports of applicants to determine

whether to hire them. Unpaid debt and delinquencies can prevent members of the

military or defense contractors from obtaining security clearances or jeopardize

existing clearances; credit reports from the NCRAs demonstrate their current

financial status and credit history. There are few documents more important to

---

[1] Experian is one of the "big three" national credit reporting agencies, along with Equifax and TransUnion.

[2] Credit reports as used herein refers both to credit reports provided to consumers, sometimes referred to as consumer disclosures, and consumer credit reports provided to creditors.

1

students, homeowners, tenants, job candidates, or service-members than their
credit reports.

2.　　Congress has recognized the "vital role" and "grave responsibilities" of credit
reporting agencies and the importance of "fair and accurate" credit reporting. 15
U.S.C. § 1681a(1). Because of this, the federal Fair Credit Reporting Act
("FCRA") imposes a rigorous set of duties on credit reporting agencies to "follow
reasonable procedures to assure maximum possible accuracy" of consumer credit
information and to allow consumers to check and to dispute any errors. 15 U.S.C.
§§ 1681e(b), 1681i(a).  The law also requires credit reporting agencies to both
reinvestigate consumers' disputes and to share "all relevant information" sent by
consumers with the creditors and debt collectors that furnished the disputed
information ("furnishers") so that errors can be fixed. 15 U.S.C. § 1681i(a).  In
addition, the Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-
5(1), 75-24-5(2) ("MCPA"), and the Dodd-Frank Wall Street Reform and
Consumer Protection Act, 12 U.S.C. § 5536(a)(1)(B) ("Dodd Frank Act") apply
to bar credit reporting agencies from engaging in unfair and deceptive practices.

3.　　Over the last year, pursuant to its authority under the MCPA, the Mississippi
Attorney General's Office has obtained and reviewed documents from Experian,
its trade association, furnishers that report information to Experian, and the
vendor used by Experian to obtain public record information.  The Attorney
General's Office reviewed dozens of lawsuits against Experian and the testimony
provided in those cases, interviewed former employees, and reviewed hundreds of
complaints from Mississippi consumers.  Among them, for example, is a

2

Lieutenant Colonel in the Army National Guard, who has spent hundreds of hours

clearing up errors in his credit report, which routinely is merged with members of

his family.  The Lieutenant Colonel also has assisted numerous soldiers whose

security clearances were threatened due to errors on their credit reports, including

one childless soldier whose credit report showed he was delinquent on his child

support payments.

4.     Experian refuses to take reasonable steps to ensure the accuracy of its consumer

credit reports, as the law requires.  While no data systems are perfect, Experian

fails to take basic steps – certainly inherent in the obligation of "maximum

possible accuracy" – to eliminate known, common, and reasonably remediable

sources of error.  Experian uses an insufficiently rigorous formula to pull together

the credit history belonging to a particular consumer, knowing that it produces

significant numbers of false matches.



5.     Moreover, Experian has failed to meaningfully engage the safety valve required

by law to identify and address mistakes that are inevitable with even the strictest

procedures – the consumer dispute process.  Instead of conducting reasonable

reinvestigations of consumer complaints, Experian merely reviews consumer

disputes to assign a code to classify the complaints (e.g., "not his/hers" or

"account closed") and forwards those codes to the creditors that reported the information. Despite its independent obligation under the FCRA, Experian conducts no investigation and, did not, ███████████, even forward the explanations and evidence submitted by consumers to creditors for them to review, so that furnishers often lacked important information necessary to fully investigate consumer disputes.  Experian adopts whatever "finding" the creditor reports back, even when contradicted by information and documentation provided by consumers.[3]

6.     In short, Experian has, over more than two decades, engaged in an unyielding pattern and practice of violating federal and state law.  Experian's failure to adopt reasonable procedures to assure maximum possible accuracy and failure to conduct reasonable reinvestigations has caused significant inaccuracies in the credit reports of Mississippi consumers.  Experian has mixed up the identities of consumers.  It has reported as late or still owing accounts that were paid on time or settled in full, as well as accounts that were aged and should no longer appear on the credit report or accounts that were extinguished in bankruptcy.  It has disclosed liens and judgments, but then failed to update its records when those liens or judgments were removed or resolved.

7.     Frustrated Mississippi consumers sent almost ███████████ to Experian between March 1, 2010, and April 18, 2013.  They have gathered and provided cancelled checks, account statements, court documents, and birth certificates, and talked on the telephone with call center representatives who often are unwilling or

---

[3] Disputes related to ███████████████ often are handled ██████████ Experian.

4

unable to help them.  In the event they are able to get an error corrected, they find
that the mistake may reappear months or years later. ███████████████

█████████████████████████████████████████████

████████████████████████████ Experian has paid tens of
millions of dollars in judgments and settlements to consumers in Mississippi and
across the country over a dozen years, but has refused to take the steps necessary
to conform its conduct to the law.

8.    Mississippi consumers described to the Attorney General's Office serious
financial harms that resulted from errors in their credit reports:  they were denied
credit or paid higher interest rates; they could not open bank accounts, rent
apartments, finance their homes, or buy cars; they lost opportunities for
employment; and jeopardized their security clearances.  They expressed enormous
anxiety and anger at the impact on their reputations from false derogatory
information, often maintained over months or years and many sleepless nights.
They described spending months and years trying to resolve errors themselves.
Many still have not obtained relief and others were helped only after they
complained to regulators.  Finally, many of these consumers -- those
knowledgeable and determined enough to reach out to law enforcement --
expressed their concern for consumers who did not know or could not protect
their rights.

9.    The experiences of Mississippi consumers are consistent with, and confirmed by,
the experiences of consumers nationally.  The Federal Trade Commission
("FTC") recently reported that nearly 20% of consumers in a recent study --

which, extrapolated, would amount to 40 million individuals – had confirmed errors in their credit reports from at least one of the NCRAs; for 13% of consumers, the error was significant enough to change their credit score.[4] Thirty percent of the time, when consumers disputed an item with all three NCRAs, the agencies reached different resolutions.[5]

10.    A 2012 study by the *Columbus Dispatch* found that 6% of nearly 21,500 consumers who complained to the FTC during a 30-month period beginning in 2009 and nearly 8% of 1,842 who complained to state attorneys general in 2009 and 2010 indicated that their files included someone else's information; nearly one-third of those consumers were unable to get the credit bureau to correct the error.[6] Almost 200 consumers said their reports showed them as deceased, and at least one of those consumers was told by the NCRA that it had investigated and verified the report of his death.[7]

---

[4] FTC, *Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003*, at v (Dec. 2012), *available at* http://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf. The study only assessed the change in the credit score if the NCRA made the change requested by the consumer. Because the 13% does not include consumers for whom the NCRAs did not change the claimed errors, the actual number of consumers who have a lower credit score because of errors in their credit report likely is higher. Indeed, the study found that of the 21% of study participants who identified at least one potentially material error, the dispute process resulted in no change, and for another 41%, errors were only partially remedied.

[5] *Id.* at 54.

[6] Mike Wagner and Jill Riepenhoff, *Credit Scars: Mixed and Marred*, Columbus Dispatch, May 7, 2012, *available at* http://www.dispatch.com/content/stories/local/2012/05/07/mixed-and-marred.html.

[7] Mike Wagner and Jill Riepenhoff, *Credit Scars: Credit-Reporting Agencies' Failure to Address Damaging Errors Plaguing Thousands of Americans Prompts Call for*

11.    Experian's business model not only tolerates, but rewards errors.  ██████████

███████████, a company owned in part by Experian, receives fees ████

████████████████████████████████.[8]  Experian also earns revenue by

deceptively selling credit monitoring services and educational credit scores to

consumers who cannot trust the accuracy of its credit reports. In 2013, Mississippi

consumers paid Experian more than ██████████ for credit monitoring products

alone.[9]

12.    Most courts have held that private litigants cannot obtain injunctive relief under

the FCRA against Experian. Private settlements and judgments against the

company have failed to incentivize compliance with the law.  As consumer

groups have noted, the power of the marketplace cannot operate to force Experian

to correct the pattern or prevalence of errors in its credit reports:

> It is essential to keep in mind that the paying clients of the
> credit reporting industry are not consumers, but the
> creditors who furnish or use the information contained in
> the CRAs'[10] databases. . . . Thus, unlike almost all other
> business relationships, consumers who are unhappy with
> the actions of a CRA cannot vote with their feet – they
> cannot remove the information or take their business
> elsewhere. Creditors, in contrast, do have the ability to
> switch between CRAs if they wish. And vigorous
> investigation of consumer disputes is likely to drive
> creditors away. Traditional competitive market forces
> therefore provide little incentive for CRAs to incur the

---

*Swift Action*, Columbus Dispatch, May 6, 2012, *available at*
http://www.dispatch.com//content/stories/local/2012/05/06/credit-scars.html.

[8] ████████████████████████████████████████████████████

[9] ██████████████████████████████████████

[10] NCRA and CRAs are used interchangeably to refer to the national credit
reporting agencies.

> costs to institute new procedures that ensure information is
> accurate or to undertake investigations to correct errors,
> since these activities primarily benefit consumers. Only the
> FCRA itself compels such behavior.[11]

13.   In an effort to redress, deter, and punish Experian's widespread violations of the

law, the Attorney General seeks injunctive relief and also requests that Experian

be ordered to pay restitution, civil penalties, disgorgement, and statutory and

punitive damages appropriate to its long and knowing history of violating federal

and state law.

## PARTIES

14.   Plaintiff, the State of Mississippi, acting through its Attorney General Jim Hood,

brings this action in the public interest pursuant to the Attorney General's

statutory and *parens patriae* authority to enforce the MCPA, the FCRA, and the

Dodd-Frank Act.

15.   Defendant Experian Information Solutions, Inc. is a "consumer reporting agency,"

(CRA) as defined in the Fair Credit Reporting Act, 15 U.S.C. § 1681(f), and is

regularly engaged in the business of assembling, evaluating, and disseminating

information concerning consumers to furnish consumer reports to consumers and

third parties.  Experian falls within the subset of CRAs known as a "nationwide

consumer reporting agency," defined as a CRA that "regularly engages in

assembling, evaluating, and maintaining credit account and public record

information, for the purpose of furnishing consumer reports to third parties

---

[11]  *Credit Reports: Consumers' Ability to Dispute and Change Inaccurate Information:*
*Hearing Before the H. Comm. on Fin. Servs.*, 110th Cong. 3 (2007) (statement of Chi Chi
Wu, Nat'l Consumer Law Ctr.).

bearing on a consumer's credit worthiness, credit standing, or credit capacity." 15 U.S.C. § 1681a(p). Experian's North American headquarters are located in Costa Mesa, California, and Experian is authorized to do business within Mississippi. Experian is, by far, the largest of the three national credit reporting agencies, with global revenue of $4.713 billion in the year ending March 2013. At all relevant times, Experian has been doing business, and continues to do business, regularly in the State of Mississippi, including by compiling and disclosing the credit reports of Mississippi consumers and by selling credit products and services to Mississippi consumers.

## JURISDICTION AND VENUE

16. Jurisdiction and venue are proper under Miss. Code Ann. §§ 75-24-9, 75-24-19, and 11-5-1, as well as under 15 U.S.C. § 1681s(c); 12 U.S.C. §§ 5564(f) and 5565. Experian is subject to personal jurisdiction under Miss. Code Ann. § 13-3-57 because at all relevant times Experian did business in Mississippi.

## FACTUAL ALLEGATIONS

I. **EXPERIAN HAS FAILED TO IMPLEMENT REASONABLE PROCEDURES TO ENSURE THE MAXIMUM POSSIBLE ACCURACY OF CONSUMER CREDIT REPORTS IN VIOLATION OF THE FAIR CREDIT REPORTING ACT.**

17. The FCRA demands that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). "Maximum possible accuracy" requires

9

more than technical or literal accuracy. A consumer report is inaccurate not just for an error, but also if it is potentially misleading or incomplete.[12]

18.    Experian has failed to employ reasonable procedures to ensure the accuracy of its credit reports, and, as a result, has caused and permitted errors in the credit reports of Mississippi consumers. Mississippi consumers have complained about these errors in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and lawsuits against Experian. The Attorney General's Office also has confirmed likely errors in its review of ▮▮▮▮▮▮▮▮▮▮▮▮▮. These consumer complaints, lawsuits, and ▮▮▮▮ result from and reflect systemic problems in (1) mixing the records of Mississippi consumers, (2) failing to update public record information in a timely manner, (3) allowing inaccurate or aged information to reappear on their credit reports, (4) allowing inaccurate information to reappear on credit reports after the information had been removed, and (5) failing to accurately report tradelines and debts that were extinguished in bankruptcy, and (6) accepting and reporting inaccurate or incomplete information from furnishers, among other errors.

19.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ Upon information and belief, even this ▮▮▮▮ rate of disputes fails to

---

[12] *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998); *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986).

reflect the number of consumers affected by errors in their credit reports who

either do not detect them or do not file disputes.

20.     The FTC provides guidance on what constitutes reasonable procedures to ensure

maximum possible accuracy:

> If the CRA's review of its procedures reveals, or the CRA
> should reasonably be aware of, steps it can take to improve
> the accuracy of its reports at a reasonable cost, it must take
> any such step. It should correct inaccuracies that come to
> its attention. A CRA must also adopt reasonable
> procedures to eliminate systematic errors that it knows
> about or should reasonably be aware of, resulting from
> procedures followed by its sources of information. For
> example, if a particular credit grantor has often furnished
> erroneous consumer information, the CRA must require the
> creditor to revise its procedures to correct whatever
> problems cause the errors or stop reporting information
> from that creditor.[13]

21.     Further, if the NCRA:

> learns or should reasonably be aware of errors in its reports
> that may indicate systemic problems (by virtue of
> information from consumers, report users, from periodic
> review of its reporting system or otherwise), it must review
> its procedures for assuring accuracy and take any necessary
> steps to avoid future problems.[14]

**A.      Experian Fails to Take Reasonable Steps to Improve the Accuracy of
Consumer Reports.**

22.     Upon information and belief, despite its enormous data, resources, and analytic

capacity, Experian does not employ an internal system or review mechanism

---

[13] FTC, *Report — Forty Years of Experience with the Fair Credit Reporting Act:
An FTC Staff Report with Summary of Interpretations 2011* at 67 (hereinafter "Forty
Years of Experience"); *see also* http://www.gpo.gov/fdsys/pkg/CFR-2011-title16-
vol1/pdf/CFR-2011-title16-vol1-part600-app-id1024.pdf.

[14] *Id.* at 68.

sufficient to maintain the accuracy of consumers' credit histories, ██████████



Indeed, the CFPB recently found:

> While the NCRAs' data screens do find errors by
> identifying anomalies and inconsistencies, these checks
> rely on underlying furnisher data to be valid. The NCRAs
> do not conduct independent checks or audits to determine if
> the data is accurate, such as contacting a consumer to ask if
> she is properly associated with an account or if the balance
> reported on an account is true, or checking the record-
> keeping practices of a furnisher. The NCRAs generally rely
> on furnishers to report information on consumers that is
> complete and accurate.[15]

23.    Instead of conducting its own review, Experian claims that its records are ████

████████████████████████████████████████

████████████████████In effect, Experian shifts its burden to employ

reasonable procedures to ensure the maximum possible accuracy of credit reports

to consumers, relying on them to obtain, understand, and dispute their credit

reports.  This is a poor "audit" mechanism by any measure, but even more so here

---

[15] CFPB, *Key Dimensions and Processes in the U.S. Credit Reporting System: A review of how the nation's largest credit bureaus manage consumer data* at 19, (Dec. 2012), *available at* http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf (hereinafter "Key Dimensions").

given the limitations Experian imposes on consumers' access to their credit

reports and ability to dispute information (*see*, Section VI) and its unwillingness

to address errors reported by consumers (*see*, Section I(B)).

       **1.**      **Experian's procedures permit and do not prevent "mixed files."**

24.    Upon this shaky foundation, Experian adds more teetering blocks.  Upon

information and belief, Experian knows that its procedures to create consumer

credit reports are over-inclusive and fail to reliably match credit information with

the correct consumer, resulting in credit reports that merge the credit histories of

distinct consumers.  These errors are so frequent that they have been given a name

– "mixed files."

25.    Experian relies on ███████████████████████████████ to

aggregate all of its information associated with a particular consumer. A ████ is

meant to be unique to a consumer, but often consumers are ███████████████

███████████████████████████████████████████████████████

While Experian did not, in response to the Attorney General's subpoenas, provide

the algorithm it applies to associate data with a specific consumer, litigation and

other public information indicate that Experian relies on partial matches in

consumer identifying information to determine whether data records belong to the

same person.  Thus, in deciding whether a mortgage in the name of John Smith

belongs with a tax lien owed by J. Smith, a student loan paid off by John C.

Smith, and a car repossessed from John Smith, Jr., Experian looks ██████

███████████████████ and other more specific information – such as

███████████████████████████████████████ – but

only to the extent it has this information. Even when it has more specific

information, Experian ████████████████████████████ Presumably, the

algorithm assigns weight to each of these factors in assessing a match.

26.     The screen used by Experian is not rigorous enough to prevent false matches and

yields an expected – and unacceptable – number of errors.  Upon information and

belief, Experian knows that its matching criteria produce false positives – that

there is a reasonable possibility that different consumers will be merged into a

████████████████ and, ultimately, a single credit report.[16]

27.     

---

[16] The matching criteria used to create and merge ████ also increases the number
of fragmented files, resulting in incomplete credit reports.  Fragmented files are
████████████████████████████████████████████████████████
████████████████████████████████████████████████████ which
indicated that it was not combining all of a consumer's relevant account information with
consumers ████████████████████████████████████████
████████████████████



28.  ███████████████████████████████████████████

█████████████████████████████████████████████

███████████

29.  This overly aggressive matching may lead to consumers being erroneously

"matched" with credit information belonging to other consumers with different

names and addresses.  Upon information and belief, these loose matching

procedures also contribute to the mixing of consumers' files with identity thieves.

If an identity thief adopts some of a victim's personal identifying information,

upon information and belief, Experian's ████████████ merges the victim's

information with the identity thief's information, even though many of the

identifiers do not match.[17]

30.  Mixed files often arise because Experian provides credit reports to creditors

without requiring that they provide ██████████████████████

███████████████████████.[18] For example, a creditor

---

[17] National Consumer Law Center, *Report – Automated Injustice:  How a mechanized dispute system frustrates consumers seeking to fix errors in their credit reports* at 9 (Jan 2009).

[18] █████████████████████████████████████

████████████████████████████████

████████

can ask for the report for Kathy Herman, 123 Main Street, Jackson, MS 01234,

without providing ████████████████. Upon information and belief,

Experian knows that this lack of detail can cause it to respond with the credit

information of more than one consumer that, in part, matches the identifying

information.  Requiring creditors to provide ██████████████ or ████████

████ would allow Experian to more reliably exclude credit information that

belongs to someone else.

31.   ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

32.   Reasonable procedures to ensure maximum possible accuracy demand better

procedures to prevent mixed files.  Requiring a more reliable match of the data

Experian has would be a reasonable step to ensure maximum possible accuracy of

credit reports and to reduce this known source of errors, especially given the

significant harm to consumers who are victims of mixed files. ████████████

████████████████████████████████████████████████

████████████████████████████ Despite recognition of

16

the importance of addressing mixed files and the high risk presented by the

problem, upon information and belief, Experian has not fixed it.

33.    Every year, Experian receives a significant number of ▮▮▮▮▮ and lawsuits,

including lawsuits and ▮▮▮▮▮ filed by Mississippi consumers, regarding

mixed files.

34.    For example, Consumer 1, a Lieutenant Colonel in the Army National Guard who

lives in Madison, Mississippi, has had his credit report repeatedly mixed with his

father and grandfather, who have the same first and last name, but different

suffixes.  (They are "Sr." and "Jr.;" he is the "III").  His grandfather's credit card,

opened when Consumer 1 was a few years old, and his father's mortgage both

appeared on his credit report.  He disputed all of these mistakes through online

forms and by mail and telephone, but not once has a dispute initially been

resolved in his favor; in all, he has spent hundreds of hours trying to correct his

credit report.  He has bought the various monitoring services and credit report

products to try to stay on top of errors in his credit report because derogatory

credit information would jeopardize his Top Secret security clearance and has

stopped him from getting a loan before.  He has helped many of the soldiers he

commands avoid losing their security clearances due to errors on their credit

reports, including one soldier who had no children but whose credit report showed

arrearages on child support.

35.    Consumer 2 of Tupelo, Mississippi, also has been the victim of a file mix-up.

Apparently, someone with the same last name used to live at her address and that

person's new address and at least one of her accounts appears on Consumer 2's

credit report. She complained to Experian, but could not get the erroneous information removed. Because of her mixed file, she received collection calls for the other individual and has seen her own bills routed to the wrong address, causing problems when she did not pay. When she goes online to access her credit report and must confirm her identity, she has to confirm the other person's new address or cannot access the system.

36.   The experience of these consumers is reinforced by the complaints of many other Mississippi consumers and by consumers from across the country. The news show *60 Minutes* featured the story of a consumer, Judy Thomas, of Ohio, whose file was mixed with Judith Kendall, of Utah. After 6 years, daily calls to the NCRAs, and hundreds of letters (including letters from creditors confirming that the debt was not hers), Ms. Thomas could not get the credit bureaus, including Experian, to fix her report.[19]  It took a year of litigation to resolve the error. In the meantime, Ms. Thomas was prevented from co-signing student loans, obtaining credit, or taking advantage of favorable interest rates to refinance her mortgage.

37.   Upon information and belief, despite evidence of systemic problems in its matching criteria, Experian continues as before, failing to employ reasonable procedures to avoid mixed file errors and subjecting Mississippi consumers to continued errors in their credit reports. Despite being on notice of this significant source of error, the Mississippi Attorney General's Office found no evidence ██

███████████████████████████████████

---

[19] *60 Minutes: 40 Million Mistakes: Is your credit report accurate?* (CBS television broadcast Feb. 10, 2013), *available at* http://www.cbsnews.com/video/watch/?id=50140748n.

██████████████████████████████████
████████████

38.     The FTC has suggested that the NCRAs may choose to accept, and impose on

consumers, these mixed file errors because creditors (its true customers) prefer to

see all potentially negative credit information, even if there is doubt about the

match, rather than miss negative information that they would want to weigh in

credit or pricing decisions.  "This preference could give the credit bureaus an

incentive to design algorithms that are tolerant of mixed files."[20]  The FCRA

prohibits precisely this trade-off.

2.     **Experian permits inaccurate public record information to be included in consumers' credit reports.**

39.     Accuracy of public record information, including information about bankruptcy,

tax liens, and civil judgments, is especially important as derogatory public record

information may have a greater effect on consumers' credit profiles and credit

scores than other information on their credit reports.

40.     As of 2007, Experian processed approximately ██████ consumer disputes

annually related to public record information.[21]

41.     Mississippi consumers have complained about inaccurate public record

information on their Experian credit reports.  Consumer 3 was unable to get

---

[20]  FTC, *Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003* (Dec. 2004), *available at* http://www.ftc.gov/reports/under-section-318-319-fair-accurate-credit-transaction-act-2003.

[21]  Upon information and belief, the current number of disputes related to public records information is significantly higher since the number of disputes likely does not reflect ██████ acquisition of █████████ and the consumer disputes related to information collection by ███████████

Experian to correct errors on her credit report until the Mississippi Attorney General's Office intervened on her behalf. An elderly woman who had been caring for her ailing husband suffering with a heart condition, Consumer 3 risked losing her deposit and contract on her lease-to-own home due to an error on her Experian credit report: a second mortgage that was discharged in bankruptcy was being reported as past due on her credit report. After Consumer 3 was threatened with a lawsuit by her landlord if she did not close on her home, the Attorney General's Office contacted Experian and only then was the error removed from her credit report.

42.    Experian contracts with ███████████ for retrieval of public record information. ████████████████████████████████████████
████████████████████████████████████████
██████████████ . In all, ████ provides ████████ public records to Experian each year.

43.    Experian has little financial incentive to ensure the collection and reporting of public record information in a timely fashion or to investigate consumer disputes regarding public record information. Experian pays ████████████ annually for the collection of public records in Mississippi. Presumably, the more frequently public records are updated, the more Experian pays for the service. Upon information and belief, Experian requires ████ to collect Mississippi consumer public records from Mississippi courthouses at certain intervals, often very infrequently. ████████████████████████████████
████████████████████████████████████████

22 ████████████████████████████████████████████
████████████

20

██████████████████████████████████ Upon information and

belief, during ███████████████████████████████, the credit report of

every consumer with a new or updated public record would be inaccurate.

44.    Further, when a consumer disputes public record information, Experian pays

████ a fee ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████[23]  This

provides a disincentive for Experian to obtain the information needed to

investigate consumer disputes about public record information.

45.    Further, Experian failed to require ██████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████ Upon information and

belief, this failure to ███████████████ to reflect bankruptcy filings,

dismissal or satisfaction of judgments or liens, and other public records

information or █████████████████ causes Experian to maintain and disclose

credit reports that are outdated or incomplete.

---

[23] ████████████████████████████████████████
██████████████████████████

       **3.**    **Experian does not prevent inaccurate data from re-appearing on consumers' credit reports after deletion or correction.**

46.    Similarly, Experian fails to comply with the FCRA's directive to prevent the reinsertion of deleted or corrected information, which is, by definition, inaccurate or unverified. 15 U.S.C. § 1681i(a)(5) (when inaccurate information is "deleted from a consumer's file . . . the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate"). The law also requires that the NCRAs notify consumers within five business days after it has reinserted information. 15 U.S.C. § 1681i(a)(5)(B)(ii). Accordingly, by permitting, allowing, or failing to maintain reasonable procedures to prevent the reinsertion of inaccurate information deleted from a Mississippi consumer's file and, upon information and belief, by failing to obtain certifications of the accuracy of such changes or notify consumers of the reinsertions, Experian has violated and continues to violate 15 U.S.C. § 1681i(a)(5). Experian's violation of the FCRA's reinsertion provisions, as described in Section V, also constitutes a failure of its procedures to ensure maximum possible accuracy of credit reports.

       **4.**    **Experian fails to ensure that OFAC alerts are accurate.**

47.    Experian offers to provide alerts on credit reports to inform creditors when consumers' names appear on the list of Specially Designated Nationals suspected of terrorism or narcotics trafficking compiled and published by the Office of Foreign Assets Control ("OFAC"). This service ███████████ , which generated over ████████████ in revenue in ███████ ████ aims to assist creditors in complying with their legal duty to ensure

22

they do not provide financing to assist in these criminal activities. However, upon information and belief, and in light of the enormous harm to a consumer cut-off from credit as a result of having been mistakenly identified as appearing on the OFAC list, Experian does not maintain adequate procedures to ensure that consumers are not listed in error. Experian issues an OFAC alert ██████████ ████████████████████████████████████████ ██████████████████████████████.

48.   Experian has attempted to distance itself from any representation that its OFAC alerts are well-tested or accurate. ███████████████████████████ █████████████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████

Experian again shifts its burden to ensure accurate information, this time to the purchaser of the information, requiring its customer to affirm that any ████ █████████████████████████████████ ████████████████████████████ ████████████████ However, Experian cannot contract out of its legal obligation to ensure the accuracy of information included in its credit reports. Especially given the damage that falsely identifying a consumer as being on a terrorism watch-list can cause, Experian has an obligation to have reasonable procedures to ensure maximum possible accuracy of this information, not to disclaim it.

49. ███████████████████████████

███████████████████████████████

██████████████████████



50. ███████████████████████████

████████████████████████████████

███████████████████████████████

██████████

     **5.**   <u>**Experian fails to ensure that accounts extinguished in bankruptcy are reported accurately.**</u>

51.    Another type of inaccuracy in Experian credit reports relates to tradelines or

collection accounts that were discharged in bankruptcy that are reported on credit

reports as due or delinquent instead of resolved through bankruptcy. Upon

information and belief, Experian has the capability to ████████████████



██████ to ascertain if they were resolved in bankruptcy, but fails to do so adequately and on a routine basis. Further, upon information and belief, Experian may report the tradeline or collection in a non-bankruptcy status ██████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ .”[24] Upon information and belief, Experian does not require furnishers to provide ██████████ ████████████████████████████████████████. In addition, once Experian receives ███████████████████ ████████████████████████████ ████████████████████████████████████████████

52.    Consumer 4 of Long Beach, MS filed for bankruptcy in 2010. Once the process was completed, he discovered that accounts covered by the bankruptcy continued to appear as active delinquencies on his credit report. He repeatedly called Experian to try to resolve the errors, and often found it difficult to reach an agent, having to answer a maze of questions and provide a credit report number in order to get through. After four years, he gave up. Though he says that he now pays all of his bills on time, he is unable to get any loans or credit cards.

53.    Experian's failure to ensure that tradelines and collection accounts are accurately reported as discharged in bankruptcy constitutes a failure of its procedures to

[24] ████████████████████████████████████████████
████████████████████████████

ensure maximum possible accuracy of credit reports. Experian knows that tradelines and collection accounts discharged in bankruptcy often are reported incorrectly, not only from the volume of consumer disputes about such inaccuracies. Experian was on notice of these inaccuracies as of at least 2008, when Experian, as part of a settlement, agreed to injunctive relief on how it reports accounts discharged in bankruptcy.

54.     This conduct is also unfair. Having tradelines or collection accounts discharged in bankruptcy appear as active accounts on consumer credit reports causes or is likely to cause substantial injury to consumers in their efforts to obtain employment or credit, as well as causing emotional harm and embarrassment, among other injuries, which are not reasonably avoidable by Mississippi consumers.

**B.      Experian Fails to Address Errors that Come to its Attention.**

55.     To ensure maximum possible accuracy (and, separately, to comply with the FCRA's command that credit reporting agencies reinvestigate consumer disputes, see Section II), the credit bureaus must maintain a reasonable process for identifying and remediating errors. This process should allow Experian to address mistakes in consumers' credit reports. As laid out in Section II, Experian fails, reliably, to do so. Instead of conducting its own investigation, Experian relies entirely upon often cursory reviews by data furnishers, acting, until recently, without the benefit of consumers' explanation and evidence. Experian fails even to review the furnishers' conclusions, adopting whatever responses the furnisher provides, even when contrary to unrebutted or irrefutable proof of errors. This

failure to address errors itself constitutes a separate failure to follow reasonable procedures to ensure maximum possible accuracy.

56.     Experian, for example, has failed to remedy its errors in reporting consumers as deceased -- even when the allegedly deceased consumer reaches out to dispute the error.   As one lawsuit recently filed in the Central District of California by a consumer deemed deceased by Experian noted, even when other data on the consumer's report indicates the person is not dead, including instances when the purportedly dead consumer communicates directly with the company, Experian has no procedures to conduct further inquiry to address the error before and until it is disputed by the consumer.[25]

57.     Consumer 5 and his wife, of Biloxi, Mississippi, went to their local bank to take out a loan to purchase a pickup truck. When the bank checked his credit, the credit report indicated that he was deceased. At first, Consumer 5 and his wife thought it was funny, but months later, after repeated attempts to correct this error with Experian, their situation had lost its humor.  He had been confused with his father, whose middle name was Consumer's 5 first name and who had died ten years before.  Because Consumer 5 could not get Experian to recognize the error, he had to rely for the truck loan on his wife's credit, which was not as good as his and which resulted in their paying a higher interest rate.  It was not until after he contacted the FTC, almost a year later, that Consumer 5 was able to persuade Experian that he was not dead.

---

[25] Complaint, *Claydon v. Experian,* No. 8:14-cv-00480 (C.D. Cal. Mar. 31, 2014).

58. The Attorney General's investigation revealed other systemic failures to ensure the accuracy of consumer credit reports. For example, employees who identified errors had no ability to fix them absent an actionable consumer dispute (and, as discussed later, verification by the furnisher█████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████  Former call center employees handling consumer disputes interviewed by the Attorney General's Office also described a press for speed that created an environment ripe for data entry errors and failures to accurately reflect consumers' disputes. Though Experian was responsible for and on notice of these issues, it has not taken the steps necessary to address them.

**C.   Experian Does Not Identify, Address, or Prevent Errors in Data from Unreliable Sources.**

59. Upon information and belief, Experian does not routinely examine furnisher dispute or error patterns and does not systematically identify, remediate, or exclude data from furnishers that have high consumer dispute rates or other types of problems that frequently result in consumer disputes. According to documents produced to the Attorney General's Office, ██████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

28

60.  ██████████████████████████████████████████

     ███████████████ is particularly problematic with unreliable sources, such as

     debt collectors.

61.  In 2012, the Federal Trade Commission sued a large debt collection agency, Asset

     Acceptance (since acquired by the Encore Capital Group), for failing to properly

     investigate consumer disputes and reporting to the NCRAs information it had

     reason to suspect was inaccurate.[26]  TransUnion had sued Asset Acceptance the

     previous year for breach of contract for reporting information on 5.7 million

     consumer accounts that was neither accurate nor complete.[27]  Upon information

     and belief, before – and even after – that action, Experian continued to include

     data from Asset Acceptance in its credit reports.  Reasonable procedures to ensure

     maximum possible accuracy certainly would have required Experian to

     investigate or address obvious errors from this data source, and to look for similar

     problems with other furnishers.

62.  Debt collectors like Asset Acceptance Corporation are known to be especially

     problematic furnishers of data.  According to the Consumer Financial Protection

     Bureau ("CFPB"), nearly 40% of consumer disputes relate to items provided by

     debt collectors even though debt collectors only supply about 13% of the accounts

     reported to the NCRAs.[28] ████████████████████████████████████████

     █████████████████████████████████████████████

---

[26] *United States v. Asset Acceptance, LLC,* No. 8:12-CV-182-T-27EAJ (M.D. Fla.
Jan. 30, 2012).

[27] *TransUnion v. Asset Acceptance, LLC,* No. 2011L007199 (Ill. Cir. Ct. July 12,
2011).

[28] CFPB, *Key Dimensions, supra,* at 14.

29



This is true even though Experian is aware of specific problems that arise when debt is sold or transferred to collection agencies, which may cause the account to appear twice on a consumer's credit report (e.g., first as a Macy's branded account and then as an Asset Acceptance account when the account is purchased by Asset Acceptance or assigned to it for collection). This misleadingly makes it appear that the consumer has an additional delinquency and more outstanding debt than is actually the case. Further, as laid out in Section V, debt collectors often fail to report or misreport the date on which consumers' accounts originally became delinquent, using the date the debt collector acquired the account rather than the date of the last payment, thus re-aging the account. This results in credit items remaining on consumers' reports even though it has been more than 7 years and 180 days from the date on which the debt was charged off or placed for collection, in violation of the FCRA. 15 U.S.C. § 1681c(a) (providing that "no consumer reporting agency may make any consumer report containing . . . [a]ccounts placed for collection or charged to profit and loss which antedate the report by more than seven years").

63.



64.

65.



**D.      Experian's Representations that it Provides Accurate Credit Reports and its Failure to Employ Reasonable Procedures to Ensure the Maximum Possible Accuracy of Credit Reports are Also Unfair and Deceptive Practices.**

66.       On its website, Experian misleads and deceives consumers into believing that the credit reports it provides are accurate.  One such representation includes: "Consumers should expect that the information reported about them is an accurate reflection of how they have handled their credit obligations over time."[29] Experian goes on to tell consumers that errors on credit reports are "rare," which, based on the volume of disputes and corrections resulting from those disputes, is a deceptive statement.[30]  Consumers are told that Experian is "in pursuit of 'error-free' data" and that it uses the "highest quality of information." These statements mislead consumers about Experian's practices, its knowledge of patterns and sources of errors in its data, its lack of efforts to correct errors, and the accuracy

---

[29] Experian, http://www.experian.com/ourcommitment/our-responsibility.html (last visited May 9, 2014).

[30] *Id.*

of information in Experian's credit reports.[31]  Consumers are not informed about the existence or frequency of mixed files, inaccurate or outdated public record information or information reported by collection agencies or other furnishers, erroneous OFAC alerts, re-aged accounts, and other systemic failures of accuracy that may affect their credit reports.  Those omissions, particularly in light of Experian's affirmative assurances, are deceptive and create a false and misleading impression of the accuracy of credit reports provided by Experian.  Accordingly, these representations and omissions mislead or are likely to reasonably mislead consumers about material characteristics of credit reports provided by Experian and about Experian's commitment and capacity to provide accurate credit reports.

67.   Additionally, Experian's failure to maintain reasonable procedures to ensure the maximum possible accuracy of consumer credit reports not only violates the FCRA, but also is unfair.   The injury inaccurate credit reports are likely to cause is substantial, from loss of employment opportunities, to being declined for or offered unfavorable terms for credit, to the emotional harm and embarrassment suffered by consumers, among other things.  Consumers do not have the ability to avoid Experian's inaccurate credit reporting, and, as explained in Section II, often cannot correct it, nor can they reasonably avoid the injuries caused by an inaccurate credit report.  In fact, consumers and creditors, both, are injured by inaccurate credit reports, which prevent credit from being made available at all or on terms appropriate to consumers' actual risk.

## II.   EXPERIAN DOES NOT CONDUCT REASONABLE REINVESTIGATIONS OF CONSUMER DISPUTES.

_____
[31] *Id.*

68.  Even a reasonably accurate credit reporting system (which this is not) inevitably will yield errors.  Apart from (and as part of) its obligation to employ reasonable procedures to ensure maximum possible accuracy, Experian has a duty under the FCRA to conduct a reasonable investigation of consumer disputes and to remedy inaccuracies uncovered in that process.  15 U.S.C. § 1681i(a)  (requiring that "if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . .").[32]  In conducting that investigation, the NCRA "shall review and consider all relevant information submitted by the consumer."  15 U.S.C. § 1681i(a)(4).

69.  Experian fails to conduct any – let alone a reasonable – reinvestigation of consumer disputes regarding their credit history or accounts.  Nor does it "consider" any credit information provided by consumers.

70.  As a result, Experian has allowed information that is unverified, incorrect, or misleading, and that could have been detected through a reasonable investigation, to appear on the credit reports of Mississippi consumers.

---

[32] The requirement that an investigation be reasonable was inserted in the 2003 amendments to the Fair Credit Reporting Act, although it had been established in cases for many years before 2003.

**A.    Experian Does Not Itself Reinvestigate Consumer Disputes.**

71.    To "reinvestigate" a consumer dispute, Experian employees prepare an
Automated Credit Dispute Verification ("ACDV") or Credit Dispute Verification
("CDV") on which they reduce consumers' disputes and evidence to a two or
three digit code chosen from a list (e.g., "not his/hers" or "disputes amount") and,
███████████████(those changes are discussed in Section III), sent only that form
to the furnishers of consumers' information through an automated processing
system called "e-OSCAR" (Online Solution for Complete and Accurate
Reporting).  As a matter of policy, ██████████████, Experian did not transmit
any documents that were provided by consumers.[33]

72.    ████████████████████████████████████████████████████
████████████████████████████████████████
████████████    Moreover, interviews conducted with former Experian
employees confirm that Experian's investigation involves nothing more than
completing and sending ACDVs and that Experian provides no direction to
employees to conduct any investigation of their own.

73.    Experian's only "consideration" of consumers' disputes is to reduce the dispute to
a code and submit them to furnishers.  Experian makes no independent judgment
about whether consumers' assertions of errors or its own data is accurate.  Upon
information and belief, Experian does not determine whether there are
inconsistencies in the consumer's file that would confirm the consumer's

---

[33] Upon information and belief, E-OSCAR is owned by a separate entity, the On-
Line Data Exchange LLC, or OLDE, of which Experian, along with the other NCRAs, is
a partial owner.

35

assertion. Former employees also said that, except in very limited circumstances, they did not rely on documentary evidence from the consumer or furnisher – billing statements, cancelled checks, or the like – to confirm or reject disputes regarding consumers' credit information (as opposed to ministerial changes in a consumer's address or other identifying information, for example). Nor, upon information and belief, does Experian seek to validate a dispute by determining whether it is consistent with other complaints it has received or errors it has identified, including whether the furnisher of the information is reputable and has proved reliable in the past.

74.   The FTC has issued guidance that makes clear that reasonable reinvestigation requires "a good faith effort to determine the accuracy of the disputed item or items.   In some cases, evidence submitted by the consumer (e.g., a clear copy of a dated cancelled check paying off an account showing an outstanding balance), standing alone, will make it clear than an item is inaccurate or incomplete."[34]

75.   The Attorney General's Office reviewed dozens of . In those cases, there was not any evidence that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Instead, as laid out below, Experian ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮

---

[34] FTC, *Forty Years of Experience Report, supra,* at 76.

76.   For example, the long-standing errors in Consumers 6's credit report could have
      been avoided had Experian conducted a reasonable reinvestigation of their
      dispute. Consumers 6, a married couple in Gautier, Mississippi, made a mistake
      on their taxes in 2007. Several years later, the State of Mississippi sent them a
      letter demanding an additional payment and they immediately paid the balance
      owed. The State nonetheless imposed a tax lien, which was then picked up by
      Experian and added to their credit reports. Consumers 6 obtained a letter from the
      State indicating that the lien was imposed in error, which they sent to Experian in
      support of their dispute. Experian updated their credit reports to indicate that the
      lien was paid, but would not remove the lien from their records – which accurate
      reporting required. Had Experian simply read the letter provided by Consumers 6
      – nothing more sophisticated or burdensome was required – it would have had
      plain evidence of the error and could have corrected their credit report. It was not
      until after the couple complained to the Consumer Financial Protection Bureau,
      that, within days, Experian corrected their report.

77.   Court rulings have put Experian on notice that relying on ACDVs, in lieu of
      meaningful, substantive reinvestigations, is insufficient to satisfy its
      reinvestigation duties under the FCRA. In *Apodaca v. Discovery Financial
      Services*, 417 F. Supp. 2d 1220 (D.N.M. 2006), for example, Plaintiff's credit file
      had been mixed with another Ms. Apodaca with a different social security number
      in a different city in New Mexico. As she tried to fix her report in time to close
      on the purchase of a house, Plaintiff wrote, repeatedly, to the credit bureau
      (Equifax) with proof that she was not the Ms. Apodaca with a prior bankruptcy.

Though she explained, repeatedly, that two digits of the social security numbers had been transposed and that her date of birth differed from the other Apodaca, and provided copies of the relevant bankruptcy documents, Equifax sent only a generically coded dispute, "not mine." When Equifax's public records vendor checked the records, without the benefit of Ms. Apodaca's details and documents, they did not notice the differences in the identifiers.

78.    The District Court of New Mexico, ruling on Equifax's motion for summary judgment, considered whether the consumer mustered sufficient evidence to suggest that Equifax acted willfully, and therefore was subject to punitive damages. The Court's opinion applies with equal force to Experian's stilted and ineffectual investigation process:

> Based on the evidence of record, a rational factfinder could conclude that Equifax knew that the pointless repetition of the cursory CDV procedure by its various agents and contractors was not going to resolve Plaintiff's dispute in a timely manner and only served to delay the matter until Plaintiff tired of the process or proceeded to litigation.[35]

79.    Experian's reliance on ACDVs and CDVs is neither reasonable nor efficient particularly where consumers have put it on notice of the specifics of their disputes or supplied documents explaining or verifying the errors. In the words of the *Apodaca* district court, the "cost of correctly performing the investigation in this manner the first time might well be less expensive than the 'reinvestigation' procedure . . . actually employed in this case, which simply repeated the cursory CDV process over and over again with the same result."[36]

---

[35] *Id.* at 1234.

[36] *Id.* at 1232.

38



82.     Experian's reliance on ACDVs and CDVs to "process disputes" does not satisfy

its obligations to reinvestigate disputes under the FCRA.  Nor does quickly

reviewing consumer disputes solely in order to code them and pass them to

furnishers, whose directions (as described in paragraphs 95-98 below) Experian

will uncritically adopt, amount to "considering" a consumer's dispute, as the

FCRA demands.

**B.      Experian Creates Impermissible Obstacles to Reinvestigating Disputes.**

83.     The FCRA requires NCRAs to conduct reasonable reinvestigations of consumer

disputes "free of charge," and nowhere indicates that credit bureaus can condition

that reinvestigation on obtaining a credit report.  15 U.S.C. § 1681i(a)(1)(A).

84.     However, consumers cannot file a dispute with Experian without having first

obtained their credit report and providing the identification number on that report.

████████████████████████████████████████████

████████████████████████████████████████████

Even though consumers are entitled one free report annually from each NCRA, Experian's requirement presents a barrier to consumers invoking their dispute rights when the consumer has difficulty accessing the free annual report. *See e.g.* ¶ 142.

85.  Consumer 7, from Chunky, Mississippi, has been unable to persuade Experian that he is not deceased. In 2011, when he attempted to buy a car, the dealer informed him that, according to Experian (alone among the credit bureaus), he was dead. Despite calling Experian numerous times, he has been unable to correct his credit report. Consumer 7 was unable to file a dispute because Experian call center representatives advised him that he had to buy his credit report in order to file a dispute and he did not have the money for it, especially since he was told that if he purchased a credit report, he automatically would be signed up for a monthly monitoring service. Because of the credit report error, Consumer 7 reports that he was unable to obtain conventional credit and had to resort to a subprime lender that charged higher fees and a larger down-payment.

86.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

87.   This is clearly contrary to the FTC's guidance, entitled "NO PREREQUISITES TO DUTY TO INVESTIGATE," which notes that "[a] CRA's obligation to investigate disputed items is not contingent upon the consumer's obtaining a file disclosure from the CRA . . ."[37]

### C.   Experian's Staffing and Compensation Makes it Difficult for Consumers to Initiate Disputes and Impossible for Employees to Adequately Record and Investigate Them.

88.   Even those consumers who pay for credit reports or obtain their annual free credit reports can find it hard to reach an Experian representative to file disputes by phone.  Many Mississippi consumers complained that it was difficult or impossible to reach an Experian representative by telephone to file disputes. This has been a consistent problem for Experian and the other NCRAs, which, in response to complaints of excessive wait times and difficulty reaching customer service representatives, were required in a 2000 consent order with the FTC, to maintain adequate personnel.[38]

89.   Even though Experian is twice the size of its next competitor, as of ██████████ ████████████████████████████████████████████████ ██████████████

90.   Former Experian call center employees told the Attorney General's Office that they had no more than three to five minutes to handle each call, which was particularly inadequate if a consumer had questions, a complicated dispute, or disputed multiple items.  They emphasized the enormous pressure they faced to

---

[37] FTC, *Forty Years of Experience Report, supra,* at 77.

[38] *See* Consent Decree, *FTC v. Experian Mktg. Info. Solutions, Inc.*, No. 3-00CV0056-L (N.D. Tex. Jan. 19, 2000).

speed through processing disputes and meet "production" quotas, which would make it difficult to fully capture disputes, let alone investigate them. Each employee's phone showed the duration of the current call and the employee's average call time including the number of calls waiting in the queue, emails were sent out regularly that included the call times of every representative, and a white board in the command center, visible from the call center floor, broadcast overall metrics of all the call centers and the number of days behind they were on processing incoming mail. Employees described competitions within the office for speed, bonuses for meeting quotas and for top sellers, and probation for those whose numbers were low. ████████████████████

████████████████████████████████████████

███████████

91.   Former employees observed that this drive for speed affected Experian's accuracy. Often, the notes in a consumer's record did not reflect what the consumer reported saying during a previous phone call, nor did the resolution seem to address the consumer's dispute. Employees handling mail found they had to sacrifice careful review when consumers submitted large volumes of documents. Other employees noted that they frequently saw mistakes in credit reports that seemed to be caused by human error or by a failure to properly handle the original dispute. All of these factors make it less likely that errors, once identified, are correctly resolved.

92.   These quotas and compensation incentives are confirmed by ████████████

████████████████████████████████████



**D.    Experian's Reliance on Furnishers to Conduct an Investigation is Unreasonable.**

93.    The Fifth Circuit Court of Appeals, ruling more than twenty years ago in a case

against Experian's predecessor, TRW, held that credit reporting agencies have a

duty of investigation independent of furnishers.  The case, *Stevenson v. TRW*, 987

F.2d 288 (5th Cir. 1993), involved a consumer whose report included accounts

belonging to another John Stevenson living in Arlington, Texas, and to his son,

John Stevenson, Jr.  Finding that the FCRA "places the burden of investigation

squarely" on the credit reporting agencies, the Court of Appeals affirmed a

finding that TRW's failure to do its own investigation violated the FCRA, further

noting that "[i]n a reinvestigation of the accuracy of credit reports, a credit bureau

must bear some responsibility for evaluating the accuracy of information obtained

from subscribers."[39]

---

[39] *Id.* at 293.  *See also, Saenz v. TransUnion*, 621 F. Supp. 2d 1074, 1083 (D. Ore. 2007) (rejecting TransUnion's contention that "creditors are better situated than reporting agencies to determine the accuracy of disputed information" as "rest[ing] upon a significant mischaracterization of its duties under the FCRA").

94.   When a furnisher receives an ACDV, generally it must respond to the credit

reporting agency within 30 days and either confirm that the data is accurate as

reported or provide the corrected information. 15 U.S.C. § 1681i(a)(10(A).

Experian simply adopts or, in the words of courts and consumer advocates,

"parrots" whatever direction it receives from the furnisher.  Furnishers, not

Experian, conduct and determine the results of any re-investigation.

95.   



96.

97.  ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████ However, the Mississippi Attorney

General's Office found no evidence – ████████████████████

██████ – that it changed its practice to do anything more than parrot furnishers'

responses.

98.  A number of former employees confirmed to the Mississippi Attorney General's

Office that, if a consumer called in to question the results of a dispute, they would

simply read the furnisher's response.  Further, ████████████████████



99.  Yet the language of the FCRA places the burden of proof in a dispute

investigation on the furnisher, not the consumer, as the Act provides that if

disputed information is inaccurate or cannot be verified, it should be deleted.  15

U.S.C. § 1681i(a)(5)(A).  Thus, if a consumer provides evidence and

documentation that she is correct, and the furnisher responds without such

evidence, the disputed information is "unverifiable" by nature, and should be

deleted.

100.  Consumer 8, a Southaven, Mississippi, resident was the victim of identity theft.

Though she repeatedly submitted a police report and identity theft affidavit to

Experian (and the other credit bureaus), she was told that the creditors had

confirmed her identity and that the disputed items therefore would not be

changed.  Because her credit report includes judgments that are not hers, this

consumer has been unable to rent an apartment or get a bank account and has to

make all of her payments in cash.

101.  Experian knows or should know, from the plain language of the FCRA and court

decisions interpreting it, that simply adopting the furnishers' unverified responses

does not constitute reasonable reinvestigation.[40]

102.  Experian's reliance on furnishers is especially unreasonable since, upon

information and belief, Experian knows, or should know, that furnishers

themselves often do not adequately investigate consumer disputes.  Having failed

████████████████ to provide consumers' dispute letters and supporting

documents to the furnishers, and instead providing only a code that categorizes

the dispute (and, perhaps, a brief narrative description of the dispute, *see*, Section

---

[40] *See, Cushman v. Trans Union Corp*, 115 F.3d 220, 225 (3rd Cir. 1997) (holding
that a reinvestigation "must consist of something more than merely parroting information
received from other sources."); *Soghomonian v. United States*, 278 F. Supp. 2d 1151,
1156 (E.D. Cal. 2003) (unreasonable for NCRA to defer entirely to source of information
without considering the information in the consumer's dispute) *vacated as a condition of
settlement*, 2005 WL 1972594, No. 99-CV-5773 (E.D. Cal. 2005).

III), it would be unreasonable to believe that furnishers could investigate

consumers' complaints.

103.    In fact, a number of furnishers have complained that the dispute codes are "vague

and broad," and that the NCRAs do not always provide sufficient information to

allow them to understand or investigate disputes.[41]



104.    In addition, upon information and belief, Experian has long known, or has had

reason to know, that furnishers typically verify information simply by returning to

the same electronic records that generated the disputed information in the first

place.  Thus, if there is an error in the furnisher's system, the erroneous

---

[41] FTC and Bd. of Governors of the Fed. Reserve Sys., *Report to Congress on the Fair Credit Reporting Act Dispute Process* at 17 (Aug. 2006)

information will be used to "investigate" the dispute and the incorrect information is verified as accurate.

### E.     Experian Refuses to Investigate Legitimate Consumer Disputes.

105.   In many instances, Experian refuses to conduct even this limited process of classifying consumer disputes, improperly and deceptively representing that a consumer previously has filed the same dispute and refusing, as a result, even to pass information regarding the dispute to the furnisher.

106.   The FTC has indicated that NCRAs "must assume a consumer's dispute is bona fide, unless there is evidence to the contrary."[42]  Such "contrary" evidence might include non-specific allegations and form letters with blanket disputes of all information in the consumer's file, which are indicia of the involvement of the type of credit repair organizations that file frivolous disputes. *Id.*  Further, "a consumer reporting agency may terminate a reinvestigation of information disputed by a consumer under that paragraph if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information." 15 U.S.C. § 1681i(a)(3)(A).

107.   Generally, the NCRAs will code disputes into three broad categories:  ownership ("not mine"), status (payments were not late or the debt was paid or is in the wrong amount), or general (a catch-all).  Upon information and belief, if a consumer's subsequent dispute on a tradeline is of the same type as a previous dispute, the new dispute will be deemed duplicative and will not be

---

[42] FTC, *Forty Years of Experience*, *supra*, at 77.

reinvestigated, even if the disputes are actually different. Thus, if a consumer complained that a record of a late payment on his Chase card was an error (status dispute), and then later filed a separate dispute that he had paid off his Chase card, which still showed a balance (status dispute), the dispute regarding the balance would not be investigated. Further, if the first dispute is assigned a general code (catch-all), Experian will consider any subsequent dispute regarding that tradeline to fall within its scope, and will treat it as a multiple – and, therefore, uninvestigated – dispute.

108.    The failure to investigate these subsequent disputes is another systemic failure of Experian's reinvestigation process.

      **F.**    **Experian Does Not Provide Consumers with the Same Information it Gives Creditors, Undermining Consumers' Ability to Dispute Inaccuracies.**

109.    As laid out in Section VI, Experian fails to provide full credit files to consumers. Consumers cannot dispute erroneous information that is shared with potential creditors, but not disclosed to them.

      **G.**    **Experian's Failure to Reinvestigate Consumer Disputes is Also Unfair and Deceptive.**

110.    Experian's failure to investigate consumer disputes is unfair because it hinders or prevents consumers from rectifying errors caused by deficiencies in Experian's practices in creating credit reports and by other sources of error.  Consumers suffer or are likely to suffer substantial injury from being unable to remedy erroneous information in their credit reports, from loss of employment opportunities, to being declined for or offered unfavorable terms for credit, to emotional harm and embarrassment, among other things. Consumers do not have

the ability to avoid the injuries caused by Experian's failure to reinvestigate disputes because they have no control over whether creditors, employers, or others will rely on credit reports in making decisions and have no control over which credit reporting agency they use to obtain consumer credit reports.

111.    In addition, Experian misrepresents to consumers that it evaluates furnishers' reviews of their disputes.  In standard, form language that Experian sends to consumers, it acknowledges that it forwards consumers' disputes to furnishers for their investigation, but then promises: ████████████████

████████████████████████████████████████████

Because Experian merely adopts, and does not depart from, furnishers' conclusions regarding disputes, this is a misleading statement that reasonably leads consumers to believe that Experian assesses furnishers' response to consumer disputes.  This misrepresentation is material as Experian is obligated to reinvestigate consumer disputes and misleads consumers into believing it performs this essential part of the reinvestigation process, when in fact it does not.

**III.    EXPERIAN FAILS TO PROVIDE ALL RELEVANT INFORMATION REGARDING CONSUMER DISPUTES TO THE FURNISHER OF THE INFORMATION.**

112.    Until ████████, Experian refused to forward to furnishers documents provided by consumers to explain or substantiate their disputes.  At least one federal district court has found that "refusal to forward . . . supplemental material to [the furnisher] may be considered a willful or reckless violation of the FCRA."[43]

---

[43] *Dixon-Rollins v. Experian*, 753 F. Supp. 2d 452, 463 (E.D. Pa. 2010), *citing* 15 U.S.C. § 1681i(a)(2).

113.    As the FTC has explained, the duty to transmit information allows the furnisher to

be "fully informed of the basis for the dispute and . . . research relevant sources

(e.g., original applications or payment ledgers)." The FTC's guidance continued:

> A CRA does not comply with this provision if it merely
> indicates the nature of the dispute, without communicating
> to the furnisher the specific relevant information received
> from the consumer. For example, if the consumer claimed
> "never late" and submitted documentation (such as
> cancelled checks) to support his/her dispute, a CRA does
> not comply with the requirement that is provide "all
> relevant information" if it simply notifies the furnisher that
> the consumer disputes the payment history without
> communicating the evidence received. The CRA may
> comply in all cases by forwarding all communications and
> documents provided by the consumer.[44]

114.    Mississippi consumers have spent significant time and money sending, often by

certified mail to make sure they are received, letters to Experian with cancelled

checks, their social security cards, letters from creditors, and a range of other

documents. ███████████████████████████████████████████

███████████████████████████████████████

115.    Further, upon information and belief, the ACDV field that permits inclusion of a

narrative to summarize or provide key details from consumer disputes is not used

in the majority of the ACDVs, and, when it is, often fails to convey either the

substance of or support for the consumers' complaints. The CFPB found that, on

average, the narrative field was used by the NCRAs only 26% of the time. Former

Experian employees also reported never using the narrative field or being directed

not to use it. The pressure on Experian employees to meet production quotas and

---

[44] FTC, *Forty Years of Experience Report, supra*, at 77-78.

51

compensation benchmarks made it infeasible or unlikely that they would take the

additional time to provide detailed descriptions of consumers' disputes.

116.    As of ▮▮▮▮▮▮▮; e-OSCAR began to permit Experian to transmit consumer

documents to furnishers.  Thus, for

example, Experian would not forward documents in the case of a consumer who

disputes that he or she is liable for a debt because the consumer is only an

authorized user, which is a common dispute.  Nor will Experian forward to its

public records vendor a copy of an order vacating a judgment that the consumer

had submitted by mail.  Given the ease and negligible cost of transmitting

information electronically, these constraints are unreasonable and inconsistent

with Experian's duties under the FCRA.

117.    As with Experian's other violations of the FCRA, the failure to provide

consumers' dispute documents to furnishers, particularly given the fact that

Experian defers entirely to furnishers' investigation results, is an unfair practice.

By failing to provide dispute documents and letters explaining the alleged errors

to furnishers, it is less likely that the errors will be corrected.

118.    Further, Experian misleads consumers about its new policies and practices for

sharing dispute information with furnishers.  In a recent webinar for consumers,

Experian's Director of Public Education, Rod Griffin, promised that "every single

document" a consumer provides is sent to the furnisher.[45]  Yet, Experian knows

that this representation, as a matter of policy, is untrue.  Based on those

representations, consumers would reasonably believe that Experian sends every

document consumers submit with their disputes to furnishers.  This

misrepresentation is material as many consumers devote significant effort to

collecting documents and drafting explanations of errors in their credit reports

based on the understanding that their information will be seen and evaluated by

entities with the power to correct them.

**IV.      EXPERIAN FAILS TO EXCLUDE NEGATIVE OBSOLETE ACCOUNTS
           APPEARING ON CONSUMERS' CREDIT REPORTS.**

119.    The FCRA requires that negative accounts that are more than 7 years old be

removed from consumers' credit reports.  15 U.S.C. § 1681c(a).  The 7 year

period begins, for accounts that are placed for collection (either internally or with

a third party debt collector) or charged off (moved from profit to loss on the

creditor's balance sheet), 180 days after the first missed payment.  15 U.S.C. §

1681c(c).  This date is sometimes referred to as the "Date of First Delinquency."

120.    Mississippi consumers complained that obsolete negative information past this 7

year limit has erroneously appeared on their credit reports.  Not only do these

errors cause information that ought to be removed from consumers' credit reports

to continue to appear, but they also make any delinquencies appear to be more

---

[45] *Webinar Recording:  Clients, Credit Reports, and Credit Scores*, Ctr. for Fin.
Social Work at 42:11 (Mar. 20, 2014).
http://www.socialjusticesolutions.org/2014/03/26/webinar-recording-clients-credit-reports-credit-scores/.

recent, and therefore, likely more relevant to creditors' or employers' decisions. More recent delinquencies also have greater impact on consumers' credit scores.

121.     Accounts reported by debt buyers or collection agencies are especially prone to these types of errors.  Upon information and belief, when debt is transferred, which is often more than once, the date of first delinquency should stay the same, but instead often drops off or is replaced with the date that the collector or buyer acquired the debt.  Mississippi consumers reported that accounts had been re-aged, for example, with the date of the dispute replacing the date of their delinquency when their accounts transferred to debt collectors.

122.     In some measure, these errors may be attributed to the fact that Experian permits miscoding of debt buyers or collection agencies as "factoring companies" according to expert testimony offered in *Toliver v. Experian*, No. 4:12cv02436 (S.D. Tex. July 5, 2013), Affidavit of Edwin Johansson at 2, ECF No. 48-1. ███

████████████████████████████████████████████████

███████████████████████████████████████ The impact of this coding is significant: ██████████ are original creditors. Upon information and belief, by treating debt collectors, like LVNV, as █████

████████████████████████████████████████████████

█████████████████████████████████ This has the effect of re-aging consumers' accounts to allow obsolete debt to remain improperly on consumers' credit reports or to cause the debt to appear more recent, and therefore more damaging, than it is.  In Plaintiff Toliver's case, the miscoding made her 6 year old debt seem like a recent delinquency.   Experian

does not list the date of first delinquency on consumer credit reports, making it difficult for consumers to identify the error. Further, upon information and belief, Experian does not ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

123.     Experian's failure to exclude obsolete accounts also is unfair because it permits derogatory aged accounts to continue to appear on credit reports more than 7 years past their date of first delinquency. This prevents consumers from putting behind them past errors or adversities and deprives them of the opportunity, mandated by the FCRA, to rebuild their lives and their credit. That causes or is likely to cause substantial injury to consumers – from loss of employment opportunities, to being declined for or offered unfavorable terms for credit, to the emotional harm and embarrassment suffered by consumers. Consumers do not have the ability to avoid Experian's reporting of obsolete accounts, and, as explained in Section II, often cannot correct it; nor can they reasonably avoid the injuries caused by that inaccuracy.

## V.     EXPERIAN FAILS TO PREVENT INFORMATION THAT WAS DELETED OR CORRECTED FROM BEING REINSERTED ON CONSUMER CREDIT REPORTS.

124.     Adding insult to injury, after many consumers spent months or years trying to get inaccurate information removed from their credit reports, they later find that the inaccurate information has resurfaced into their credit reports, a problem referred to as "reinsertion." The problem of reinsertion was so significant that Congress specifically added protections for consumers to prevent wrongful reinsertion.

Now, section 1681i(a)(5) of the FCRA requires that "[a] consumer reporting agency shall maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted" unless "the person who furnishes the information certifies that the information is complete and accurate" and "notif[ies] the consumer of the reinsertion in writing not later than 5 business days after the reinsertion."

125.    Mississippi consumers reported that inaccurate information that they had finally gotten removed from their credit reports later reappeared.  According to numerous public reports and testimony, the problem seems to arise because Experian deletes or updates the information, but the furnisher does not.  The furnisher, or a buyer or collector that acquires an account, may continue to report the inaccurate credit information, which then is added again to the consumer's credit report because steps have not been taken to "hard delete" the record – in other words, not merely remove it, but block it from reappearing. Upon information and belief, despite numerous complaints, deleted or updated information continues to resurface in consumers' credit reports because Experian has failed to take reasonable measures to permanently suppress inaccurate information or otherwise prevent the reinsertion of inaccurate information.

126.    Likewise, Experian's failure to employ reasonable procedures to prevent inaccurate information that was deleted or has been corrected from being reinserted on consumer's credit reports is also unfair.  In many instances, it took consumers months or years to get the errors corrected, only to have the errors reappear.  Having erroneous or inaccurate information reinserted on a consumer's

56

credit report is unfair in that it causes or is likely to cause substantial injury –

from loss of employment opportunities, to being declined for or offered

unfavorable terms for credit, to the emotional harm and embarrassment suffered

by consumers. Consumers do not have the ability to avoid Experian's reinsertion

of inaccurate information, nor can they reasonably avoid the injuries caused by

the reappearance of the inaccurate information.

## VI.   EXPERIAN DOES NOT PROVIDE CONSUMERS WITH THEIR FULL CREDIT FILES.

127.   The FCRA requires that the NCRAs, upon a consumer's request, "clearly and

accurately disclose to the consumer: (1) All information in the consumer's file at

the time of the request . . . ." 15 U.S.C. § 1681g(a)(1). Yet Experian consistently

fails to provide consumers with all such information, and in fact sometimes

provides reports to consumers that contain less information than reports provided

to creditors or other users. Certainly, the report provided to a creditor on a

consumer represents information in the NCRA's file for that consumer.

128.   A Mississippi consumer interviewed by the Attorney General's Office

complained that derogatory credit information relied on by potential creditors did

not appear on the credit reports he obtained. This is consistent with reports from

elsewhere in the country, such as that of Judy Thomas, featured on *60 Minutes*

and discussed above.[46]

129.   Upon information and belief, the problem seems to arise because Experian uses

███████████ in retrieving a credit report for a consumer than they do when

pulling a credit report for a creditor. When consumers order their credit reports

---

[46] *See* CBS, *40 Million Mistakes, supra.*

from Experian's website, they are required to answer a series of questions --

beyond their name, address, and social security number, and including prior

addresses or credit accounts, payments, and balances, designed to precisely

identify them (and, thus, their credit information). Consumers seeking their credit

reports by phone or mail are required to provide their social security numbers and

dates of birth. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ Thus, the credit report provided to the creditor

may have additional information not provided in the consumer's own credit

report. As laid out above, this is particularly problematic as the looser matching

criteria are more likely to generate mixed files.

130.   While this is not information belonging to the requesting consumer, it is

information in the consumer's "credit file." Therefore, the FCRA requires that

this information be provided to the consumer. Not only does this comply with the

plain language of the statute, but it is the only interpretation that carries out the

FCRA's purpose to allow consumers to receive and, if necessary, dispute

information that creditors, employers, landlords, or other parties use to assess

their creditworthiness and reliability.

131.   Experian also misrepresents that it provides consumers with the same information

that their creditors receive. On its website, Experian describes the difference

between a consumer disclosure, the report provided to the consumer, and a credit

report, the report provided to creditors. The key difference is that the consumer disclosure includes some inquiries (such as account monitoring and those resulting in preapproved offers) and some address and demographic information that are not displayed on the credit report viewed by lenders.[47]

132.   That description fails to inform consumers of a material difference between the two reports – that due to the ████████████████ used to populate the credit report viewed by lenders, the credit report provided to lenders may include additional accounts or personal identifying information that is not included in the report provided to the consumer. This material omission, particularly in light of Experian's assurance that the reports are identical, misleads or is likely to mislead consumers. This misrepresentation causes or is likely to cause injury to consumers because they cannot dispute information that is not in the credit reports provided to them. Consumers are not entitled to see credit reports relied upon by lenders, even if the lender makes an adverse decision based on the report. Thus, consumers may never discover if the report relied upon by a lender contains inaccurate derogatory information, and due to Experian's material omission, consumers will not know to ask or investigate.

133.   The practice of not providing consumers with information that is provided creditors and other users is also unfair. This practice causes or likely causes substantial injury to consumers – from loss of employment opportunities, to being declined for or offered unfavorable terms for credit, to the emotional harm

---

[47] Experian, http://www.experian.com/credit-education/credit-report-faqs.html, "What's the difference between a consumer disclosure and a credit report?" (last visited May 9, 2014).

and embarrassment suffered by consumers due to inaccurate information in their credit reports that they cannot see or correct. Consumers cannot reasonably avoid these injuries because they are not informed that the creditor or other user may see more information than is in the credit report the consumer receives.

## VII.   EXPERIAN DECEPTIVELY MARKETS CREDIT MONITORING SERVICES AND CREDIT SCORES.

134.   Experian has managed to turn its failures to maintain accurate credit reports and its refusal to investigate consumer disputes into a business opportunity. As already noted, Experian requires consumers to obtain a credit report – often paid – in order to dispute potential errors in their credit reports. When consumers are able to reach an agent over the phone to file disputes – about errors that Experian often could have and should have prevented – Experian markets credit monitoring to them, which purports to alert consumers to erroneous information when it appears in their credit reports. Figuratively, Experian has taken the lemons it gives consumers and turned them into lemonade for the company. The products – though ███████ – are marketed deceptively and provide little benefit to consumers.

135.   ████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████



136. Former Experian employees interviewed by the Mississippi Attorney General's Office said that they were required to pitch Experian's credit monitoring services and other products to consumers on every call. Experian admonished employees who failed to push the products, tracked their sales volume, and gave prizes to employees who sold the most products and services.

137. On Experian.com and other secondary websites owned and/or operated by Experian, advertisements lure consumers in with a promise of "free" credit scores or $1 credit reports, but are designed to enroll consumers in a monthly credit monitoring service. For example, on Experian's home page, the company features in large font, prominently situated at the top of the page:

## WHAT'S YOUR EXPERIAN CREDIT SCORE? FIND OUT NOW FOR **FREE** WHEN YOU CHECK YOUR CREDIT REPORT FOR **$1**

In much smaller font, at the bottom of the page, Experian discloses:

> When you order your $1 Credit Report & FREE Score, you will begin your 7-day trial membership in Experian Credit TrackerSM. If you don't cancel your membership within

48

the 7-day trial period,* you will be billed $19.95 for each month that you continue your membership.[49]

138.    When consumers click on the offer, they are directed to a new screen, which again describes "Your $1 Experian credit report and FREE score," with no disclosure on that page of a monthly fee.

139.    After entering their name, address, and email address, consumers can access a third screen, which at the middle of the page, to the right, prominently recaps the consumer's costs:

| Your Order | |
|---|---|
| Experian Credit Report | $1.00 |
| Experian Credit Score | Free |
| Order Total: | $1.00 |

140.    Underneath this box, in smaller font, Experian notes that it "Includes 7-day trial membership in Experian Credit Tracker. You may cancel your trial membership at any time within 7 days without charge."

141.    Only after scrolling down to a portion of the page that is not initially visible, on the opposite side of the screen, under "Payment Information" does Experian remind consumers, again in smaller font: "When you order your $1 Credit Report and FREE Score here, you will begin your 7-day trial membership in Experian Credit Tracker[SM] Credit Monitoring. **You may cancel your trial membership at any time within 7 days without charge.**" (emphasis in original). The price of the credit monitoring service is not disclosed anywhere on this page.

---

[49] Experian, http://www. Experian.com (last visited May 9, 2014) (emphasis in original).

142.   Thus, in order to obtain the "free" credit score or $1 credit report or score, consumers are enrolled in the monthly credit monitoring, costing $17.95, $19.95, or another standard fee each month.

143.   One Mississippi consumer interviewed by the Attorney General's Office works in the information security field and considers herself a savvy internet user.  Yet, in trying to obtain her free credit report, she ended up at an Experian website and clicked on the link to obtain her "free" annual credit reports.  It took her a few months to realize that her credit card was being billed for a monthly monitoring service that she did not realize she had signed up for.  It was extremely difficult to cancel the service; after one call to Experian, she was promised that the charges would be reversed, but she received no credit and continued to be billed each month.  Ultimately, she was billed $104.65 and reimbursed $29.90; one charge for $14.95 was applied 14 days after her reimbursement.

144.   Not only are Mississippi consumers often deceived into purchasing monthly services or products from Experian, many have complained that it is difficult to cancel the service.  This includes Mississippi consumers who are entitled to free credit reports,[50] but who complained that they were unable to obtain them and therefore resorted to purchasing them.  The result often is that consumers who were entitled to a free credit report not only do not get their free report, but instead become consumers paying monthly fees to Experian.

---

[50] Experian is required by law to provide consumers with their credit reports for free on an annual basis or if their credit reports are inaccurate because of fraud or if a company takes adverse action against them based on information in their credit reports.

145.   The possibility of identity theft worries many consumers, and Experian markets
credit monitoring services to consumers as a way to "stop identity theft in its
tracks," leading consumers to believe that they will be protected against identity
theft if they purchase the service.[51]  That is misleading.  Credit monitoring is not
an effective tool in catching common types of identity theft, including
unauthorized charges to a consumer's existing accounts.  Rather, Experian's
credit monitoring only tracks the opening of new accounts or inquiries by a
potential creditor.

146.   Most basically, Experian leads consumers to believe that they have to commit to a
paid service to protect themselves against identity thieves, when the FCRA
entitles consumers who are victims of identity theft to place a free 90-day fraud
alert on their credit report and get their credit reports from all three credit bureaus
for free.  15 U.S.C. 1681c-1(a)(1)(A).  Experian fails to disclose to consumers
their rights to this no-cost assistance.

147.   Consumers are not entitled to obtain their credit scores for free, unlike their credit
reports.  Consumers preparing to seek a mortgage, school, or car loan, applying
for security clearance, or when trying to rehabilitate their credit after a period of
hardships may purchase their credit score.  Virtually every lender checking
consumers' credit scores will rely on their "FICO" scores, a credit score generated
by the Fair Isaac Corporation.  The scores Experian sells to consumers is its own

---

[51] Experian: Protect My ID, http://www.protectmyid.com/ (last visited May 9,
2014).

proprietary score based on the "PLUS Score model," which is not used by lenders.[52]

148.    Unless consumers are hunting for information on Experian's credit score, consumers will not understand that they are purchasing "educational" credit scores, and not their official scores weighed by creditors.  On Experian's home page, it says in large capital letters, "WHAT'S YOUR EXPERIAN CREDIT SCORE?"  There is no asterisk or other indicator directing the consumer to scroll down to the bottom of the page to read a disclosure about the credit score they are buying.  At the bottom of the screen, in tiny print, it states:  "Calculated on the PLUS Score model, your Experian Credit Score indicates your relative credit risk level for educational purposes and is not the score used by lenders.  Learn More."[53]

149.    Consumers who follow that link will learn that Experian's credit score will "help you see and understand how lenders view your credit worthiness. It is not used by lenders, but it is indicative of your overall credit risk."  This pop-up box goes on to explain that there are many reasons consumers' credit scores may differ across the credit bureaus (e.g., because furnishers may not report to all of the bureaus) and that:

> lenders and insurers use several different credit scoring models so don't be surprised if your lender gives you a score that's different from the PLUS Score. Just remember

---

[52]   Experian also markets VantageScore, a credit score developed jointly by Experian, Equifax, and TransUnion and, according to the VantageScore website, is used by some secondary market participants.  Upon information and belief, the "Experian credit score," is the educational score derived from the PLUS Score model, and not the VantageScore.  Experian, http://www.experian.com/consumer-products/credit-score.html (last visited May 9, 2014); Vantage Score, http://www.vantagescore.com/who-uses-our-model (last visited May 9, 2014).

[53]   Experian, http://www.experian.com (last visited May 9, 2014)

> that your associated risk level is often the same even if the
> number is not. For some consumers however, the risk
> assessment of a PLUS Score could vary, sometimes
> substantially, from a lender's score. If the lender's score is
> lower than your PLUS Score, it is possible that this
> difference can lead to higher interest rates and sometimes
> credit denial.

This difficult-to-find and -follow disclosure seems designed to, and would, assure

consumers that, in most instances, Experian's credit score will be a relevant and

accurate gauge of their creditworthiness.

150.   The CFPB compared the educational credit scores offered by each of the three

NCRAs (they each market their own) with the FICO credit scores and found that

19% of consumers would fall into a different credit score category, meaning they

"would likely have a moderate but meaningfully different impression of their

credit score than would a creditor using the other score."[54] These score

discrepancies can give consumers the false hope that they qualify for credit or low

interest rates when they do not, or might dissuade them for applying for credit for

which they would qualify.   Additionally, when the educational score is artificially

high, it can lead to consumers apply for credit, thereby generating additional

credit inquiries, which can negatively affect their actual credit scores.

151.   By failing to prominently and clearly disclose to consumers the material fact that

the score it sells is not the same as the score relied on by creditors and may not

help them to evaluate their creditworthiness and by falsely assuring consumers

---

[54] CFPB, *Analysis of Differences Between Consumer- and Creditor- Purchased Credit Scores* at 17 (Sept. 2012), *available at* http://files.consumerfinance.gov/f/201209_Analysis_Differences_Consumer_Credit.pdf.

that its credit score is no less reliable or relevant than other credit scores,

Experian's misleads consumers in marketing its credit score.

## VIII.  EXPERIAN ACTED WILLFULLY IN FAILING TO COMPLY WITH ITS STATUTORY DUTIES.

152.  Upon information and belief, Experian made an intentional decision to operate a system without reasonable safeguards to maximize accuracy or to resolve disputes when errors arose.  The conduct outlined in this complaint does not represent inadvertent or isolated human errors, but resulted from conscious policy decisions, made and maintained over time, in the face of contrary guidance and enforcement actions by regulators and consumers and court decisions.

153.  Accordingly, Experian has acted willfully in failing to meet its obligations under the FCRA, as discussed herein.  Willfulness, as interpreted by the Supreme Court, encompasses both knowing and reckless violations.[55]

154.  For decades, Experian has resolved enforcement actions by government entities and been subject to countless disputes, settlements, and judgments in cases brought by individual consumers or classes of consumers regarding violations of the FCRA and unfair and deceptive practices.  These cases involve, among others, consumers whose files were mixed with those of family members or strangers, living consumers classified as deceased, public record or other account information that is inaccurate, disputes that are never investigated or resolved (until after litigation) – the very same conduct that is the subject of this Complaint. Experian's failure to remedy these recurring violations suggests reckless or knowing disregard for its obligations under the FCRA.

---

[55] *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 59-60 (2007).

155.   Beginning in 1991, the FTC brought an enforcement action against TRW (now

Experian) due to dissatisfaction with the accuracy of information reported in

consumer credit reports.  Experian entered into a consent order with the FTC

requiring the company to take steps related to the same errors described in this

Complaint:

> II (1) "Maintain reasonable procedures to prevent the
> occurrence or reoccurrence of Mixed Files, including . . .
> implementing and utilizing changes to its system designed
> to prevent, to the extent it reasonably can, the reoccurrence
> of Mixed Files, once known; . . . [and continue to make]
> efforts to improve its information gathering, storing, and
> generating systems to reduce the occurrence of Mixed
> Files";
>
> (2) "Follow reasonable procedures to assure maximum
> possible accuracy of the information [in consumer credit
> reports], including . . . [m]aintaining reasonable procedures
> . . . to detect logical errors . . . [and informing subscribers]
> that they will be expected to attempt to" obtain and report
> to TRW full identifying information from consumers,
> which includes "full last and first name; middle initial; full
> street address; zip code; year of birth; any generational
> designation; and social security number," to use such
> information when requesting consumer credit reports from
> TRW;
>
> (3) Reinvestigate information in a consumer's credit report
> which the consumer disputes as incomplete or inaccurate,
> including (i) contacting the consumer if TRW cannot
> determine the nature of the dispute, (ii) informing the
> "source used to verify the disputed information" of the
> "nature and substance" of the consumer's dispute, (iii)
> "[a]ccepting the Consumer's version of the disputed
> information and correcting or deleting the disputed item,
> when the Consumer submits . . . documentation obtained
> from the source . . . confirming that the disputed
> information . . . was inaccurate or incomplete,  and (iv)
> employing reasonable procedures to reinvestigate disputes
> regarding mixed files;

68

(4) Maintain "reasonable procedures so that items . . . which are deleted or corrected as inaccurate or unverifiable upon reinvestigation, do not subsequently [re]appear"; . . . .

(8) When subscribers purchase consumer reports for resale to an employer or potential employer of that consumer, either, maintain "strict procedures to insure the public record information that is likely to have an adverse effect on a Consumer's ability to obtain employment is complete and up-to-date" or "notify the Consumer" of the disclosure; and

III.  For five years following the entry of the consent order, TRW was required to "measure, monitor, and test the extent to which changes in [its] computer system, including its algorithms, reduce the incidence of Mixed Files" and submit the results of its findings.[56]

156.   The consent order between TRW / Experian and 19 state attorneys general, also

reached in 1991, contains similar remedial measures.[57]

157.   In 2005, Experian entered into another consent order with the FTC regarding

allegations that Experian deceptively marketed free credit reports by failing to

adequately disclose that consumers requesting "free" reports would be

automatically signed up and charged for credit monitoring services.[58]  Less than

two years later, Experian agreed to pay $300,000 to settle charges it violated the

consent order.[59]

---

[56] *FTC v. TRW, Inc.*, 784 F. Supp. 361, 362-65 (N.D. Tex. 1991) (consent order), *amended by* (N.D. Tex. Jan. 14, 1993) (agreed order amending consent order).

[57] *TRW Inc. v. Morales*, No. 3-91-1340-H (N.D. Tex. Dec. 10, 1991) (consent order).

[58] *FTC v. Consumerinfo.com*, No. CV SA CVO5-801 AHS (C.D. Cal. Aug. 15, 2005) (stipulated final judgment).

[59] *FTC v. Consumerinfo.com*, No. CV SA CVO5-801 AHS (C.D. Cal. Jan. 8, 2007) (supplemental stipulated judgment and order for permanent injunction and monetary relief).

158.  More than two decades after the first consent judgment with the FTC and state attorneys general, Experian continues to violate the same provisions of the FCRA and persists with deceptive marketing of its credit monitoring services.

159.  The language of the FCRA, guidance from the FTC, the consent orders entered into between Experian and the FTC and state attorneys general, and millions of complaints, ████, and lawsuits from consumers on these very issues indicate that Experian knew its policies, procedures, and practices violated the FCRA and consumer protection laws.  The lawsuits brought by consumers allege failure to maintain maximum possible accuracy in consumer credit reports, failure to reinvestigate errors, and other violations of the FCRA.[60]

160.  Alternatively, Experian has acted with reckless disregard of the effect of its conduct on consumers and compliance with the law.

161.  In the alternative, the Attorney General alleges that Experian acted negligently in failing to comply with its duties under the FCRA.

### CLAIM I
Violation of the Mississippi Code § 75-24-5
(Mississippi Consumer Protect Act)

162.  The Attorney General realleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

---

[60] *See e.g., Stevenson v. TRW, Inc.*, No. 91-7142 (5th Cir. 1993); *Shaw v. Experian*, No. 3:13-cv-01295 (S.D. Cal. June 4, 2013); *Spearman v. Comenity Bank*, No. 3:13-cv-00141 (N.D. Miss. May 30, 2013); *Giardina v. Capital One Bank*, No. 1:12-cv-00053-WJG-RHW (S.D. Miss. Feb 17, 2012); *Lampley v. Bank of Am.*, No. 1:12-cv-00050-LG-JMR (S.D. Miss. Feb 16, 2012); *James v. Experian*, No. 3:12-cv-00902 (E.D. Va. Dec 26, 2012); *Smith v. Equifax*, No. 2:11-cv-00171 (N.D. Miss. Aug 15, 2011); *White v. Experian, Hernandez v. Experian*, No. 05-cv-1070 (C.D. Cal. Nov. 2, 2005).

163.    The Mississippi Consumer Protection Act § 75-24-5 prohibits Experian from engaging in "unfair or deceptive trade practices in or affecting commerce."

164.    Experian engaged in deceptive conduct through the marketing of its credit monitoring services, credit scores, identity theft protection services, in violation of § 75-24-5.

165.    Experian further violates this section through its representation that consumers receive all of the credit information provided to creditors about the consumer and its failure to always provide consumers with the same information that creditors receive about the consumer, which is deceptive and unfair, and prevents consumers from being able to identify and address errors in their credit reports.

166.    Similarly, Experian's failure to employ reasonable procedures to ensure maximum possible accuracy, its failure to reinvestigate consumer disputes and to transmit all relevant information to furnishers, and its practice of re-aging or allowing on credit reports aged, re-aged, or obsolete accounts and accounts discharged in bankruptcy to show as due or past due and of allowing corrected or deleted information to reappear are unfair practices and cannot be avoided or corrected by Mississippi consumers.

167.    Experian's representations that it provides accurate credit reports, that it evaluates furnishers' reviews of consumer disputes, and that it shares with the furnisher "every single document" a consumer provides with a dispute are deceptive and misleading.  Additionally, its failure to disclose the frequency and types of errors in consumer credit reports is deceptive and creates a false and misleading impression of the accuracy of credit reports.

168. Experian's representations and acts discussed herein reasonably mislead or are likely to mislead Mississippi consumers. These misleading representations and practices are material. Additionally or in the alternative, Experian's conduct causes or is likely to cause substantial injury to Mississippi consumers, such injuries are not reasonably avoidable by consumer, and the injury is not outweighed by countervailing benefits to consumers or to competition.

169. Additionally, all of the acts and practices that violate the FCRA discussed herein constitute unfair and deceptive practices or acts under the Mississippi Consumer Protection Act. 15 U.S.C. § 1681s(a)(1); Miss. Code. § 75-24-3(c).

170. Thus, pursuant to Mississippi Code sections 75-24-9 and 75-24-11 respectively, the Attorney General seeks injunctive relief and restitution. Experian knowingly and/or willfully engaged in the deceptive and unfair conduct described herein, and therefore the Attorney General seeks civil penalties pursuant to Miss. Code § 75-24-19(b). The Attorney General is entitled to recover costs and attorneys' fees pursuant to § 75-24-19.

### CLAIM II
Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b)
(Maximum Possible Accuracy)

171. The Attorney General realleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

172. Section 1681e(b) of the Fair Credit Reporting Act requires that, "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

173.   Experian violated and continues to violate 15 U.S.C. § 1681e(b) by failing to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer credit reports, resulting in inaccurate or misleading information being reported in credit reports of Mississippi consumers.  These inaccuracies include but are not limited to: permitting inaccurate mixed files, public record information, and OFAC alerts; failing to ensure that tradelines discharged in bankruptcy appear as such on credit reports; failing to address other errors brought to its attention; and failing to identify, address, or prevent errors in data from unreliable sources.

174.   Further, 15 U.S.C. § 1681i(a)(5) provides that when inaccurate information is "deleted from a consumer's file . . . the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate."  Upon information and belief, Experian violated and continues to violate 15 U.S.C. § 1681i(a)(5) by permitting the reinsertion of deleted, inaccurate information on credit reports of Mississippi consumers without notice to consumers or certification from the furnisher that it is accurate.

175.   Experian's conduct, action, and inaction was willful, and therefore, the Attorney General, on behalf of affected Mississippi consumers, is entitled to injunctive relief, actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681s(c).  In the alternative, Experian's conduct was negligent, entitling the Attorney General to injunctive relief, and to recover actual or statutory damages under 15 U.S.C. § 1681s(c).

176.   The Attorney General is entitled to recover its costs, including attorneys' fees, of

this action pursuant to 15 U.S.C. § 1681s(c).

CLAIM III
Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681i(a)
(Reasonable Reinvestigations)

177.   The Attorney General realleges and incorporates herein by reference the

allegations contained in the preceding paragraphs of this Complaint.

178.   Section 1681i(a) of the Fair Credit Reporting Act requires Experian to "conduct a

reasonable reinvestigation to determine whether" information disputed by a

consumer "is inaccurate and record the current status of the disputed information,

or delete the item from the file" and to "review and consider all relevant

information submitted by the consumer in the [relevant] period . . . with respect to

such disputed information."

179.   By failing to conduct reasonable reinvestigations of disputes lodged by

Mississippi consumers regarding information believed to be inaccurate in their

credit reports, by having staffing and compensation levels that make it difficult

for consumers to file disputes and employees to adequately record and

reinvestigate them, by requiring Mississippi consumers to purchase their credit

reports in order to file disputes, by relying on furnishers to conduct

reinvestigations, by failing to provide consumers with the same information it

gives creditors, and by failing to review and consider relevant information

submitted by Mississippi consumers with their disputes, Experian has violated

and continues to violate 15 U.S.C. § 1681i(a).

74

180.    Experian's conduct, action, and inaction was willful, and therefore, the Attorney General, on behalf of affected Mississippi consumers, is entitled to injunctive relief, actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681s(c).  In the alternative, Experian's conduct was negligent, entitling the Attorney General to injunctive relief, and to recover actual or statutory damages under 15 U.S.C. § 1681s(c).

181.    The Attorney General is entitled to recover its costs, including attorneys' fees, of this action pursuant to 15 U.S.C. § 1681s(c).

CLAIM IV
Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681i(a)
(Provide All Relevant Information to Furnishers)

182.    The Attorney General realleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

183.    Section 1681i(a)(2) of the Fair Credit Reporting Act provides that Experian shall provide prompt notice of consumer disputes to furnishers of information and include "all relevant information regarding the dispute [it] has received from the consumer."

184.    ████████████, for most Mississippi consumer disputes, Experian failed to provide to furnishers any documents submitted by consumers, in violation of 15 U.S.C. § 1681i(a)(2).  Even with the technological upgrades to e-OSCAR that were implemented in ████████ ████████████████████████ ████████████████████████████████████ ████████████████████, in violation of 15 U.S.C. § 1681i(a)(2).

185.    Experian's conduct, action, and inaction was willful, and therefore, the Attorney

General, on behalf of affected Mississippi consumers, is entitled to injunctive

relief, actual or statutory damages, and punitive damages in an amount to be

determined by the Court pursuant to 15 U.S.C. § 1681s(c).  In the alternative,

Experian's conduct was negligent, entitling the Attorney General to injunctive

relief, and to recover actual or statutory damages under 15 U.S.C. § 1681s(c).

186.    The Attorney General is entitled to recover its costs, including attorneys' fees, of

this action pursuant to 15 U.S.C. § 1681s(c).

CLAIM V
Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681c(a)
(Aged Accounts)

187.    The Attorney General realleges and incorporates herein by reference the

allegations contained in the preceding paragraphs of this Complaint.

188.    Section 1681c(a) of the Fair Credit Reporting Act prohibits Experian from

"mak[ing] any consumer report containing . . . [a]ccounts placed for collection or

charged to profit and loss which antedate the report by more than seven years."

189.    Mississippi consumer credit reports issued by Experian sometimes contain

collection or charged off accounts that are more than 7 years past the date the

account became delinquent or are re-aged, making the date of collection or charge

off appear more recent, in violation of 15 U.S.C. § 1681c(a).

190.    Experian's conduct, action, and inaction was willful, and therefore, the Attorney

General, on behalf of affected Mississippi consumers, is entitled to injunctive

relief, actual or statutory damages, and punitive damages in an amount to be

determined by the Court pursuant to 15 U.S.C. § 1681s(c).  In the alternative,

Experian's conduct was negligent, entitling the Attorney General to injunctive relief, and to recover actual or statutory damages under 15 U.S.C. § 1681s(c).

191.   The Attorney General is entitled to recover its costs, including attorneys' fees, of this action pursuant to 15 U.S.C. § 1681s(c).

### CLAIM VI
Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681i(a)(5)
(Prevent Reappearance of Deleted Information)

192.   The Attorney General realleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

193.   Section 1681i(a)(5) of the Fair Credit Reporting Act requires that "[a] consumer reporting agency shall maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted" unless "the person who furnishes the information certifies that the information is complete and accurate" and "notif[ies] the consumer of the reinsertion in writing not later than 5 business days after the reinsertion."

194.   Mississippi consumers' credit reports issued by Experian sometimes contain inaccurate information that was previously deleted or otherwise corrected, due to a failure by Experian to maintain reasonable procedures to prevent the reappearance of such information, in violation of 15 U.S.C. § 1681i(a)(5).

195.   Additionally, upon information and belief, Experian fails to notify Mississippi consumers when information previously deleted or corrected is reinserted into their credit report, also in violation of 15 U.S.C. § 1681i(a)(5).

196.  Experian's conduct, action, and inaction is willful, and therefore, the Attorney
      General, on behalf of affected Mississippi consumers, is entitled to injunctive
      relief, actual or statutory damages, and punitive damages in an amount to be
      determined by the Court pursuant to 15 U.S.C. § 1681s(c).  In the alternative,
      Experian's conduct is negligent, entitling the Attorney General to injunctive
      relief, and to recover actual or statutory damages under 15 U.S.C. § 1681s(c).

197.  The Attorney General is entitled to recover its costs, including attorneys' fees, of
      this action pursuant to 15 U.S.C. § 1681s(c).

CLAIM VII
Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681g(a)(1)
(Disclose Credit File to Consumers)

198.  The Attorney General realleges and incorporates herein by reference the
      allegations contained in the preceding paragraphs of this Complaint.

199.  Section 1681g(a) of the Fair Credit Reporting Act requires that "[e]very consumer
      reporting agency shall, upon request, . . . clearly and accurately disclose to the
      consumer . . . [a]ll information in the consumer's file at the time of the request."
      Experian has provided and continues to provide consumer credit reports to
      creditors that sometimes contain information that is not included in the credit
      report obtained by consumers, in violation of this provision.

200.  Experian's conduct, action, and inaction was willful, and therefore, the Attorney
      General, on behalf of affected Mississippi consumers, is entitled to injunctive
      relief, actual or statutory damages, and punitive damages in an amount to be
      determined by the Court pursuant to 15 U.S.C. § 1681s(c).  In the alternative,

Experian's conduct was negligent, entitling the Attorney General to injunctive relief, and to recover actual or statutory damages under 15 U.S.C. § 1681s(c).

201.   The Attorney General is entitled to recover its costs, including attorneys' fees, of this action pursuant to 15 U.S.C. § 1681s(c).

CLAIM VIII
Violations of the 12 U.S.C. § 5536(a)(1)(B)
(Dodd-Frank Act)

202.   The Attorney General realleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

203.   Section 5536(a)(1)(B) of the Dodd-Frank Act prohibits Experian from engaging in "any unfair, deceptive, or abusive act or practice."

204.   Experian has engaged and continues to engage in deceptive conduct through the marketing of its credit monitoring services, credit scores, and identity theft protection services, in violation of 15 U.S.C. § 5536(a)(1)(B).

205.   Experian further violates this section through its representation that consumers receive all of the credit information provided to creditors about the consumer and its failure to always provide consumers with the same information that creditors receive about the consumer, which is deceptive and unfair and prevents consumers from being able to identify and address errors in their credit reports.

206.   Similarly, Experian's failure to employ reasonable procedures to ensure maximum possible accuracy, its failure to reinvestigate consumer disputes, failure to transmit all relevant information to furnishers, and its practice of re-aging or allowing on credit reports aged, re-aged, or obsolete accounts and accounts discharged in bankruptcy to show as due or past due and of allowing corrected or

79

deleted information to reappear are unfair practices and cannot be avoided or corrected by Mississippi consumers.

207. Experian's representations that it provides accurate credit reports, that it evaluates furnishers' reviews of consumer disputes, and that it shares with the furnisher "every single document" a consumer provides with a dispute are deceptive and misleading. Additionally, its failure to disclose the frequency and types of errors in consumer credit reports is deceptive and creates a false and misleading impression of the accuracy of credit reports.

208. Experian's representations and acts discussed herein reasonably mislead or are likely to mislead Mississippi consumers. These misleading representations and practices are material.

209. Additionally or in the alternative, Experian's conduct causes or is likely to cause substantial injury to Mississippi consumers, such injuries are not reasonably avoidable by consumer, and the injury is not outweighed by countervailing benefits to consumers or to competition.

210. Therefore, pursuant to 12 U.S.C. § 5565, The Attorney General seeks restitution, disgorgement of Experian's revenue from these deceptive and unfair practices and acts, rescission of agreements with Mississippi consumers for credit monitoring services, identity theft protection services, and credit scores, damages as set forth in subsection (c), penalties, public notification regarding these violations of law, including the costs of notification, and limits on the activities or functions of Experian with regard to the offensive conduct.

## REQUEST FOR RELIEF

The Attorney General requests this Honorable Court:

A.  Declare that, on the basis of the conduct described herein, Experian violated the Mississippi Consumer Protection Act, the Fair Credit Reporting Act, and the Dodd-Frank Act;

B.  Enjoin Experian from future violations of the Mississippi Consumer Protection Act, the Fair Credit Reporting Act, and the Dodd-Frank Act;

C.  Order Experian to remediate inaccurate or erroneous information on the credit reports of Mississippi consumers;

D.  Require Experian to:

- pay restitution to consumers who were deceptively marketed products or services in violation of the Mississippi Consumer Protection Act and the Dodd-Frank Act;

- pay civil penalties under the Mississippi Consumer Protection Act and the Dodd-Frank Act;

- pay statutory or actual damages for violations of the Fair Credit Reporting Act, and punitive damages for Experian's willful violations of the Fair Credit Reporting Act; and

- disgorge revenue gained through Experian's violations of the Dodd-Frank Act.

E.  Require Experian, at its own expense, to provide notice to the public of its violations of the Dodd-Frank Act;

F.  Order Experian to pay the cost of this lawsuit, including attorneys' fees; and

G.  Such other relief as the Court deems just.

Respectfully submitted,

DATED this 15th day of May, 2014.

PLAINTIFF, STATE OF MISSISSIPPI *ex rel.*
JIM HOOD, ATTORNEY GENERAL OF THE
STATE OF MISSISSIPPI

By: _____

Geoffrey Morgan, MSB No. 3474
George W. Neville, MSB No. 3822
Mary Jo Woods, MSB No. 10468
S. Martin Millette, MSB No. 102416
Special Assistant Attorneys General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205
Telephone: 601-359-3680
Facsimile: 601-359-2003
Email: gmorg@ago.state.ms.us,
gnevi@ago.state.ms.us,
mwood@ago.state.ms.us,
mamil@ago.state.ms.us

Wynn E. Clark, MSB No. 6279
Law Firm of Wynn E. Clark
2510 16th Street
Gulfport, MS 39501
Telephone: 228-575-9996
Facsimile:  228-575-9030
Email: wynnclark@bellsouth.net

82



## IN THE CHANCERY COURT OF HARRISON COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

STATE OF MISSISSIPPI *ex rel.*
JIM HOOD, ATTORNEY GENERAL OF
THE STATE OF MISSISSIPPI                                    **PLAINTIFF**



**VERSUS**                                CIVIL ACTION NO. 14-1212(4

MAY 16 2014

JOHN McADAMS, CHANCERY CLERK

EXPERIAN INFORMATION
SOLUTIONS, INC.                                D.C.         **DEFENDANT**

### ORDER

There is before the Court the Motion of the Plaintiff, the State of Mississippi, through the Attorney General, for leave to file the unredacted Complaint under seal until further Order of the Court, because of certain information in the Complaint may constitute confidential or otherwise protected information. The Court has considered the Motion, and finds that the Motion should be granted to the following extent.

**IT IS, THEREFORE, FOUND AND ORDERED that:**

1.      The unredacted Complaint may contain confidential or otherwise protected information under *Miss. Code Ann.* §75-24-27(2-3), for which the Court should consider in an adversary hearing whether the information should be unsealed.

2.      Until the Court holds such a hearing, the Plaintiff is granted leave, *nunc pro tunc* to the time of the filing of the Complaint, to file the unredacted Complaint under seal in a closed envelope.

3.      The Plaintiff may serve the Summons and a copy of the Complaint under seal and the redacted Complaint on the Defendant.   The Defendant is ordered to file its response to the Complaint under seal.

        **SO FOUND AND ORDERED on this** _14_ **day of May, 2014.**

                                          _____

                                          **CHANCELLOR**


**Submitted by:**

**Attorney For Plaintiff**
**Wynn E. Clark**
**2510 16th Street**
**Gulfport, MS 39501**
**(228) 575-9996**
**(228) 575-9030**
**Email: wynnclark@bellsouth.net**
**Miss. Bar No. 6279**

## IN THE CHANCERY COURT OF HARRISON COUNTY, MISSISSIPPI
### FIRST JUDICIAL DISTRICT

STATE OF MISSISSIPPI *ex rel.*
JIM HOOD, ATTORNEY GENERAL OF
THE STATE OF MISSISSIPPI                                    **PLAINTIFF**

**VERSUS**                                    CIVIL ACTION NO. 14-1212(4

EXPERIAN INFORMATION
SOLUTIONS, INC.

                                                          **DEFENDANT**

**SUMMONS**

STATE OF MISSISSIPPI

TO:    EXPERIAN INFORMATION SOLUTIONS, INC.
       C/O CT CORPORATION SYSTEM
       645 LAKELAND EAST DR STE 101
       FLOWOOD, MS 39232

**Notice To Defendant**

**THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS
IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO
PROTECT YOUR RIGHTS.**

You are required to mail or hand-deliver a copy of a written response to the
Complaint to **George Neville**, attorney for the Plaintiff, whose mailing address is
Office of the Mississippi Attorney General, P.O. Box 220, Jackson, MS 39205, and whose
street address is Office of the Attorney General, Suite 1200, 550 High Street, Jackson, MS
39201. Your response must be mailed or delivered within thirty (30) days from the date of
delivery of this Summons and Complaint or a judgment by default will be entered against
you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within
a reasonable time afterward.

Issued under my hand and the seal of this Court, this 16 day of May,
2014.

                              JOHN MCADAMS, CLERK OF COURT

                              BY:    DEPUTY CLERK OF COURT

George Neville- Miss. Bar No. 3822
Office of the Mississippi Attorney General
P.O. Box 220, Jackson, MS 39205
Suite 1200, 550 High Street, Jackson, MS 39201
Phone (601) 359-3908  Fax (601) 359-2003
Email: gnevi@ago.state.ms.us

**Attorneys For Plaintiff**

IN THE CHANCERY COURT OF HARRISON COUNTY, MISSISSIPPI
THE FIRST JUDICIAL DISTRICT

STATE OF MISSISSIPPI *ex rel.*
JIM HOOD, ATTORNEY GENERAL OF
THE STATE OF MISSISSIPPI                                       PLAINTIFF

VERSUS                                    CIVIL ACTION NO.: <u>14-1212 (4)</u>

EXPERIAN INFORMATION
SOLUTIONS, INC.                                                DEFENDANT

## <u>FIRST REQUEST BY PLAINTIFF STATE OF MISSISSIPPI</u><br><u>FOR PRODUCTION OF DOCUMENTS</u>

Pursuant to Rules 26 and 34 of the Mississippi Rules of Civil Procedure, Plaintiff State of Mississippi (hereafter "State") hereby requests that Defendant Experian Information Solutions, Inc. ("Experian" or "Defendant") produce the following documents and things for inspection and copying at the offices of the Attorney General for the State of Mississippi, P.O. Box 220, Jackson, MS 39205-0220, c/o George W. Neville, Special Assistant Attorney General, in accordance with the Definitions and Instructions below, within 45 days of the date of service hereof pursuant to the Mississippi Rules of Civil Procedure.   The State requests that a copy of the documents and things for inspection be provided to Linda Singer, Cohen Milstein Sellers & Toll, 1100 New York Avenue, NW, Suite 500, Washington, DC  20005.

1

## DEFINITIONS

Unless otherwise defined in this subpoena, the following terms shall have these meanings:

1. **"EXPERIAN," "YOU"** or **"YOUR"** refer to the entity to which these discovery requests are addressed, including all owners, officers, agents and employees thereof, and any predecessor, successor, parent, subsidiary, d/b/a, and affiliated companies or other entities.

2. **"ALL"** shall be construed to include the collective as well as the singular and shall mean "each," "any," and "every."

3. **"ANY"** shall be construed to mean "any and all."

4. **"CONSUMER(S)"** refers to any individual for whom Experian has records of any kind.

5. **"CONSUMER CREDIT INFORMATION"** refers to any information collected or reported by You regarding the credit history, status, or activities of any Consumer.

6. **"CONSUMER CREDIT REPORT(S)"** refers to any information provided to a Consumer who requests a credit report from You.

7. **"CONSUMER DISPUTE(S)"** refers to any inquiry by or on behalf of a Consumer regarding whether information collected by Experian about the Consumer is accurate, properly reported, or in compliance with legal requirements, including but not limited to telephonic, written, and online inquiries made via Experian's webpage.

8. **"CREDIT REPORT(S)"** refers to ALL information collected by Experian from any source regarding a Consumer and provided to an outside entity such as Furnishers, Subscribers, Creditors, Consumers, or Employers.

9. **"EDUCATIONAL CREDIT SCORE"** refers to credit scores offered by You that are calculated on the PLUS Score model.

10. **"DOCUMENT(S)"** and **"DOCUMENTATION"** mean any writing or any other tangible thing, whether printed, recorded (in audio, video or by any other means), reproduced by any process, or written or produced by hand, including, but not limited to, letters, memoranda, notes, opinions, books, reports, studies, agreements, statements, communications (including inter-company and intra-company communications), correspondence, telegrams, logs, bookkeeping entries, summaries or records of personal conversations, diaries, calendars, telephone messages and logs, forecasts, photographs, tape recordings, models, statistical statements, graphs, laboratory and engineering reports, notebooks, charts, plans, drawings, minutes, bylaws, resolutions, records of conferences, expressions or statements of policy, lists of persons attending meetings or conferences, lists of clients or customers or suppliers, reports or summaries of interviews, opinions or reports of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of any document and revisions of drafts of any document, and any other similar paper or record. The term "document" also includes a copy of a document where the copy is not exactly the same as the original. *The term "document" also includes emails and other documents made or stored in electronic form, whether kept on computers, computer tapes, disks or drives of any type, or other media upon which information may be recorded.*

3

11. **"EMPLOYEE"** refers to a person who works in the service of another person or entity under an express or implied contract of hire, under which the employer has the right to control the details of work performance and includes current and former employees.

12. **"FURNISHER(S)"** refers to any individual, company or other entity that furnishes information that is incorporated or associated with a Credit Report.

13. **"INCLUDING"** is used merely to emphasize certain types of documents requested and should not be construed as limiting the request in any way.

14. **"MIXED FILE(S)"** refers to any Credit Report that includes information or records of any kind for more than one Consumer.

15. **"OBSOLETE INFORMATION"** refers to information in a Credit Report that is outdated or appears in violation of state or federal statutory requirements regarding the duration of time information may appear on a Credit Report.

16. **"PIN" or "PIN Matching System"** refers to Your process for matching consumer information, including Consumer Credit Information and personal identifying information, with individual consumers.

17. **"PUBLIC RECORD INFORMATION"** refers to documents issued by a county, state or federal government that typically are available to the public, including but not limited to bankruptcies, tax liens, and civil judgments.

18. **"SCRIPT(S)"** refers to any Document intended to assist Your agents or employees with proposed language to use, typically in responding to Consumer Disputes or marketing services or products to Consumers.

4

# INSTRUCTIONS

A.      Compliance with these Requests is to be made in conformance with your obligations under the Mississippi Rules of Civil Procedure.

B.      When providing your responses, please indicate the Request to which each document or answer responds in the metadata field, RequestNo.

C.      Documents shall be produced in accordance with Rule 34(b) of the Mississippi Rules of Civil Procedure and as they are kept in the usual course of business.

D.      To the extent that potentially responsive documents or responses relate to individuals or practices of regional or national scope that would have impacted or involved Mississippi, provide those documents and responses, along with Mississippi-specific information.

E.      For each document that you produce, produce the current version together with all earlier editions or predecessor documents during the relevant time period, even though the title of earlier documents may differ from current versions.

F.      These Requests shall be deemed continuing in character so as to require prompt supplemental responses if additional documents called for herein are obtained, discovered, or become known to Defendant between the time of responding to the Requests and the final disposition of this action.

G.      Requested format for documents produced electronically in response to this Request:

1.      Any documents produced in response to this Request should be provided as a Group 4 compression single-page "TIFF" image that reflects how the source document would have appeared if printed out to a printer attached to a computer viewing the file.  Extracted text will be included in the manner provided herein.  To the extent that extracted text does not exist, these images will be processed through Optical Character Recognition ("OCR") so that they are fully searchable.  Extracted text and OCR will be provided in the DAT Concordance load file. "Load files" shall be produced to accompany the images and shall facilitate the use of the litigation support database system, Concordance, to review the produced images.

2.      Document Unitization.  Each page of a document shall be electronically converted into an image as described above.  If a document is more than one page, the unitization of the document and any attachments and/or affixed notes shall be maintained as it existed in the original when creating the image file and appropriately designated in the load files.  The corresponding parent/attachment relationships, to the extent possible, shall be provided in the load files furnished with each production.

3.      Bates Numbering.  Each page of a produced document shall have a legible, unique page identifier ("Bates Number") electronically branded onto the image at a location that does not obliterate, conceal,

5

or interfere with any information from the source document.  In order to ensure that the Bates Numbers do not obscure portions of the documents, the images may be proportionally reduced to create a larger margin in which the Bates Number may be branded.  There shall be no other legend or stamp placed on the document image, except those sections of a document that are redacted to eliminate material protected from disclosure by the attorney-client or work product privileges shall have the legend "REDACTED" placed in the location where the redaction(s) occurred or shall otherwise note the location and/or location of the information for which such protections are claimed.

4.   File Naming Conventions.  Each document image file shall be named with the unique Bates Number of the page of the document in the case of single-page TIFFs, followed by the extension "TIF".  Each document shall be named with a unique document identifier.  Attachments shall have their own unique document identifiers.

5.   Production Media.  The documents should be produced on CD-ROM, DVD, external hard drive (with standard Windows PC compatible interface), (the "Production Media").  Each piece of Production Media shall identify a production number corresponding to the production "wave" the documents on the Production Media are associated with (e.g., "V001", "V002"), as well as the volume of the material in that production wave (e.g., "-001", "-002").  For example, if the first production wave comprises document images on three hard drives, the Respondent shall label each hard drive in the following manner: "V001-001", "V001-002", "V001-003".  Additional information that shall be identified on the physical Production Media shall include:  (1) text referencing that it was produced in [Case Docket No.], (2) the producing party's name, (3) the production date, and (4) the Bates Number range of the materials contained on the Production Media.

6.   Objective Coding/Extracted Meta Data.  Respondent shall produce with each production of documents extracted metadata for each document (the "Objective Coding") included in the DAT load file.  The data file shall include the fields and type of content set forth in the SPECIAL INSTRUCTIONS FOR ELECTRONICALLY STORED MATERIAL section.  Objective Coding shall be labeled and produced on Production Media in accordance with the provisions set forth above.

7.   Native format for Excel and databases.  To the extent that such documents exist in Excel or another spreadsheet program, produce the document in its native format.  To the extent that the document format constitutes a database created or maintained in Access or another software program, produce the document in its native format.  If the database is based upon proprietary software, produce whatever keys and instructions are necessary to review it.

H.   Requested format for hard copies of documents produced in response to this Request:

6

1.  create electronic copies of the documents and produce them in accordance with the procedures described in the section INSTRUCTIONS ¶ G herein, provided that you retain the originals from which the electronic copies were made until the final disposition of the matter;

2.  include a loadfile with corresponding information including the following data fields: BegDoc, EndDoc, Custodian, DocTitle, Filename, RequestNo.;

    a)  the Custodian field in the loadfile should contain the name of the custodian or location from which the hard copy document was taken;

    b)  the RequestNo. field should contain the number of the Request(s) to which the document is responsive.

I.  This Request requires you to produce all described documents in your possession, custody or control without regard to the person or persons by whom or for whom the documents were prepared (e.g., your employees, distributors or dealers, competitors or others).

J.  If, after exercising due diligence to secure the answer, you cannot answer a question in full, state your answer to the fullest extent possible and state why you are unable to answer the question fully. If the question does not apply to you, indicate that it is not applicable and state why it is not applicable.

K.  If any responsive document was, but no longer is, in your possession, custody or control, produce a description of each such document. The description shall include the following:

1.  the name of each author, sender, creator, and initiator of such document;

2.  the name of each recipient, addressee, or party for whom such document was intended;

3.  the date the document was created;

4.  the date(s) the document was in use;

5.  the title of the document

6.  a detailed description of the content of the document;

7.  the reason it is no longer in your possession, custody or control; and

8.  the document's present whereabouts and custodian thereof.

7

L.    In the event a document that is responsive to these requests is not in your possession but you have a right to obtain the document or a copy of the document from a third party, you must obtain it (or a copy) and produce it in response to these requests.

M.    If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the disposal.

N.    If you withhold any responsive document, or portion thereof for any reason, including, but not limited to, a claim of privilege, provide a detailed log that contains the following information for each document that you have withheld:

1.    the name of each author, writer, sender, creator, or initiator of such document;

2.    the name of each recipient, addressee, or party for whom such document was intended;

3.    the date of such document or an estimate thereof if no date appears on the document;

4.    description of the subject matter of the document sufficient to enable the State to assess the claim of privilege; and

5.    the claimed grounds for withholding the document, including, but not limited to, the nature of any claimed privilege and grounds in support thereof.

O.    Produce documents in the order in which you maintained them in your files, in copies of their original file folders, labeled with the folder's original file labels. Do not mask any portion of any document; produce the entire document. Produce all attachments to responsive documents attached to the responsive documents. Provide a key to all abbreviations used in documents and attach the key to the appropriate documents.

P.    If you obtain information or documents responsive to any demand or question after you have submitted your responses, you have an affirmative duty to supplement your responses with any new and or different information and/or documents that become available to you.

## SPECIAL INSTRUCTIONS FOR ELECTRONICALLY STORED MATERIAL

All electronic documents should be produced in accordance with the following instructions:

A.    Single page TIFFs at a 300 DPI resolution which are named for the Bates Number of the page. There should NOT be more than 1000 images per folder.

B.    Document level text files containing OCR or extracted text named with the Bates Number of the first page of the document.

C.     Data load file containing all of the metadata fields (both system and application – see list below) from the original Native documents with extension .dat for Concordance.

D.     The Concordance .dat file of extracted metadata should be delimited with the Concordance default characters -- ASCII 020 for the comma character and ASCII 254 for the quote character.  The use of commas and quotes as delimiters is <u>not</u> acceptable.

E.     The database field name should be included in the first line of the metadata file listed in the order they appear in the file.

F.     An image loadfile for Concordance – such as .opt.

G.     For electronic documents created in Excel (spreadsheets) or Access (databases), provide those documents in Native format.

H.     If requested by the State, specific documents shall be produced in native form.

I.     For all documents produced, provide the following:

### REQUIRED METADATA FIELDS

| | |
|---|---|
| BEGDOC | ENDDOC |
| BEGATTACH | ENDATTACH |
| ATTCOUNT | ATTACH |
| CUSTODIAN | AUTHOR |
| FROM | TO |
| CC | BCC |
| FILESIZE | PGCOUNT |
| DATERECD | TIMERECD |
| DATESENT | TIMESENT |
| CRTDATE | CRTTIME |
| LASTMODDATE | LASTMODTIME |
| LASTACCDATE | LASTACCTIME |
| TITLE | SUBJECT |
| EMAILSUBJECT | FILENAME |
| FILEEXT | MD5HASH |
| ORGANIZATION | FULLPATH |
| RECORD_TYPE | VERSION |
| VOLUME | COMMENT |
| PRINTEDDATE | ENTRYID |
| ATTLST | ITEMTYPE |
| PSTINSIDEPATH | ITEMCREATIONTIME |
| REQATTANDEES | REMINDERTIME |
| REPLYTIME | APPOINTMENTSTARTDATE |
| APPOINTMENTDURATIONTIME | APPOINTMENTCONTACT |

| CATEGORY | KEYWORDS |
|----------|----------|
| MANAGER | LASTAUTHOR |
| ENCRYPTED | FAMILYDATE |
| NATIVELINK | TEXTPATH |
| REQUESTNO | |

## SPECIAL INSTRUCTIONS FOR DOCUMENTS STORED IN PROPRIETARY DATABASES

Documents stored in proprietary databases should be produced in such a way that the data, information, and functionality of the original database(s) is not lost.

## TIME PERIOD

Unless otherwise indicated, the applicable time period for these discovery requests is from 2006 until the present.

## DOCUMENT REQUESTS

**REQUEST NO. 1:**

Produce all Documents that were not previously produced in response to the Mississippi Attorney General's Civil Administrative Subpoenas pertaining to or containing explanations, instructions, procedures, potential or actual changes, problems, issues, or concerns regarding the reporting of Consumer Credit Information satisfied, or discharged in bankruptcy or the handling of Consumer Disputes regarding such credit information.

**REQUEST NO. 2:**

Produce all executed agreements or contracts, including any amendments, appendices, exhibits, or schedules, with vendors or third parties that provide services in connection with the collection or reporting of Consumer Credit Information or the handling of Consumer Disputes. This includes but is not limited to production of unredacted agreements or contracts with LexisNexis Risk & Information Analytics Group Inc. that were previously produced with redactions.

**REQUEST NO. 3:**

Produce all executed agreements or contracts, including any amendments, appendices, exhibits, or schedules, with the top ten Furnishers, by volume of Consumer Credit Information reported.

**REQUEST NO. 4:**

Produce all depositions and/or transcriptions of testimony provided by Gerald Ochoa and Patricia Henderson when they were Your Employees, and all of Your

10

interrogatory responses, depositions and/or transcripts of testimony from January 1, 2010 and later, that were not previously produced in response to the Mississippi Attorney General's Civil Administrative Subpoenas, regarding (1) re-investigation of Consumer Disputes, (2) the criteria or process used to prepare, assemble, and produce Credit Reports and Consumer Credit Reports or the OFAC Name Matching Service (and any predecessor service), (3) verifying Furnishers' accuracy in reporting consumer information and/or investigating Consumer Disputes, (4) Mixed Files, (5) inaccurate or Obsolete Information in Consumer Credit Reports, (6) information that re-appeared on a Consumer Credit Report after being deleted, corrected, or suppressed, (7) efforts to ensure maximum possible accuracy of Credit Reports and Consumer Credit Reports (8) Consumer Credit Reports provided to creditors that contain information that is not in the Credit Report prepared for the consumer, and (9) Educational Credit Scores and credit monitoring services and products You offer to consumers and the marketing thereof.

**REQUEST NO. 5:**

Produce any presentations, reports, memoranda, agendas, and assessments provided to or requested by Your management or board of directors and Your committees (whether committees of your employees or of the board of directors), including but not limited to the Law and Policy Committee and the Reasonable Procedures Committee, regarding the subtopics in Request 4.

**REQUEST NO. 6:**

Produce all Documents that were not previously produced in response to the Mississippi Attorney General's Civil Administrative Subpoenas regarding the creation, implementation, marketing, use internally and externally of Polaris and audits, reviews, or assessments conducted using Polaris.

**REQUEST NO. 7:**

Produce all Documents that were not previously produced in response to the Mississippi Attorney General's Civil Administrative Subpoenas pertaining to or containing explanations, instructions, procedures, potential or actual changes, disclosures, problems, issues, or concerns regarding Your OFAC Name Matching Service, and any predecessor service, including but not limited to:

- all Documents relating to questions or concerns raised by the U.S. Department of Treasury regarding the Service; and

- all Documents used to market the Service.

**REQUEST NO. 8:**

Produce all Documents pertaining to or containing explanations, instructions, procedures, potential or actual changes, problems, issues, or concerns regarding the

deletion or suppression of inaccurate or Obsolete Information on Consumer Credit Reports.

**REQUEST NO. 9:**

Produce all complaints, concerns, or recommendations for change expressed by Your agents, Employees, vendors, contractors, or Furnishers regarding the subtopics in Request 4 that were not previously produced in response to the Mississippi Attorney General's Civil Administrative Subpoenas.

**REQUEST NO. 10:**

Produce all Documents regarding or reflecting Your strategies, plans, methods, and/or approaches to market and/or maximize the sales of or revenue from Educational Credit Scores or credit monitoring services or products to consumers that were not previously produced in response to the Mississippi Attorney General's Civil Administrative Subpoenas; and Documents relating to any testing or surveys of consumers' response to Your marketing of Educational Credit Scores or credit monitoring services or products and/or their satisfaction with such products and services.

**REQUEST NO. 11:**

Produce all Documents relating to Your decision to market Credit Reports for $1.

**REQUEST NO. 12:**

Produce all Documents regarding the development, implementation, enforcement, monitoring, auditing, and reviews of industry-based rules for data Furnishers.

**REQUEST NO. 13:**

Produce all Documents regarding analyses, assessments, and disclosures of how Educational Credit Score(s) marketed by You to consumers compare with FICO or other credit scores offered by You or others, including but not limited to Documents relating or responding to a comparative analysis conducted by the Consumer Financial Protection Bureau.

**REQUEST NO. 14:**

Produce a sample (size and methodology to be agreed upon) of recordings of Consumer Disputes made by phone to You by Mississippi consumers and all consumer complaints or disputes made by Mississippi consumers to You regarding Your marketing or sales of credit monitoring services or products, or Educational Credit Scores.

**REQUEST NO. 15:**

Produce any Documents reflecting or analyzing the aggregate or and/or unit cost of handling Consumer Disputes under Your existing processes and under proposed, former, or alternative procedures.

**REQUEST NO. 16:**

Produce any Documents reflecting or analyzing Your annual revenue from sales and subscriptions of credit monitoring services and Educational Credit Scores both to Mississippi consumers and, separately, to all consumers nationally.

**REQUEST NO. 17:**

Produce all Documents that were not previously produced in response to the Mississippi Attorney General's Civil Administrative Subpoenas relating to internal or external audits, reviews, evaluations, or assessments of information, data, systems, and procedures that affect the accuracy of Your Consumer Credit Reports and any changes (whether made or only considered, or recommended), including but not limited to:

- Your criteria or process used to prepare, assemble, and produce Credit Reports and Consumer Credit Reports to Consumers, Subscribers, Creditors, or Employers, including your PIN Matching System;

- Your reinvestigation process;

- Your handling of Consumer Disputes;

- Services provided by LexisNexis Risk & Information Analytics Group Inc. involving public record information; and

- Any other subtopic in Request 4

**REQUEST NO. 18:**

Produce Documents that reflect Your ownership interest in On Line Data Exchange LLC ("OLDE") and any Documents reflecting or analyzing Your financial contributions or payments to or revenue or payments from OLDE.

**REQUEST NO. 19:**

Produce Your Document retention policies in effect since January 1, 2006 and the litigation hold letter issued in connection with the Mississippi Attorney General's investigation of You.

Respectfully submitted,

DATED this _6th_ day of June, 2014.

**PLAINTIFF, STATE OF MISSISSIPPI** *ex rel.*
**JIM HOOD, ATTORNEY GENERAL OF THE**
**STATE OF MISSISSIPPI**

By: _____

Geoffrey Morgan, MSB No. 3474
George W. Neville, MSB No. 3822
Mary Jo Woods, MSB No. 10468
S. Martin Millette, MSB No. 102416
Special Assistant Attorneys General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205
Telephone: 601-359-3680
Facsimile: 601-359-2003
Email: gmorg@ago.state.ms.us,
gnevi@ago.state.ms.us,
mwood@ago.state.ms.us,
mamil@ago.state.ms.us

Wynn E. Clark, MSB No. 6279
Law Firm of Wynn E. Clark
2510 16th Street
Gulfport, MS 39501
Telephone: 228-575-9996
Facsimile: 228-575-9030
Email: wynnclark@bellsouth.net

14